**EXPRESS PUB. CO. v. SOUTHWELL.**
(No. 7783.)

Court of Civil Appeals of Texas. San Antonio.
May 25, 1927.

1. **Libel and slander ⇐19—In determining whether newspaper publication is libelous, effect must be ascertained from impression on ordinary reader.**

In determining if a newspaper publication is libelous, its effect must be ascertained from the impression it may create in the minds of average ordinary readers, not from an import it may carry to the supersensitive mind.

2. **Libel and slander ⇐15, 21—Newspaper publication, to constitute "libel" against individual, must be directed at him expressly or by reasonable deduction, and tend to injure reputation, exposing him to public hatred, contempt, ridicule, etc.**

Newspaper publication must, to constitute a "libel" against an individual, be directed at him either expressly or by reasonable deduction from its language and context, construed together, and have effect of tending to injure his reputation to extent of exposing him to public hatred, contempt, ridicule, or financial injury, or to impeach his honesty, integrity, or virtue.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Libel.]

3. **Libel and slander ⇐19—Articles concerning fire in printing plant, burning negatives of poll lists, and finding ballot boxes in unlocked room, held not "innuendo" against publisher, not interested in election contest.**

Newspaper articles concerning fire in printing plant, burning negatives of poll lists after election, during pendency of contest, and finding of ballot boxes in unlocked room, though court had directed their retention in vault, held not to constitute innuendo against publisher, not implied to be interested in contest.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Innuendo.]

4. **Libel and slander ⇐86(3)—Complaint for libel, where publication is not libelous per se, and alleged innuendo is not reasonably deducible therefrom, is demurrable.**

Complaint for libel, where publication is not libelous per se, and alleged innuendo is not reasonably deducible therefrom, is demurrable.

Appeal from District Court, Bexar County; W. S. Anderson, Judge.

Action by Charles R. Southwell against the Express Publishing Company. Judgment for plaintiff, and the defendant appeals. Reversed and remanded.

Denman, Franklin & Denman, of San Antonio, for appellant.

Hertzberg & Kercheville, of San Antonio, for appellee.

SMITH, J. In the summer of 1924, certain unsuccessful candidates in a primary election held in Bexar county instituted a suit in the Forty-Fifth district court of that county to contest said election. Pending the disposition of the suit, upon a suggestion or oral order of the judge of that court, ballot boxes used in said election, containing the poll lists and ballots cast thereat, were placed for safe-keeping in a locked room in a vault in the county courthouse.

It appears that, prior to the election and during the campaign leading thereto, the Alamo Blue Print Company, which was owned and operated by C. R. Southwell, had obtained stencils, or "negatives," of the official poll lists to be used in the election, for the purpose of printing and selling copies thereof to candidates or others desiring them. These stencils, or negatives, or impressions, had been taken from the original poll list in the custody of county officials at the courthouse. This was done with the consent of the authorities, who retained possession of the originals, which were afterwards used in the election, and then placed and preserved with the ballots, in ballot boxes stored in the courthouse.

Afterwards, on August 22, and during the pendency of the election contest, a fire occurred in the plant of the Blue Print Company, and a portion of the stencils or negatives, which, having served their purposes, could be of no further use or value, were destroyed. These stencils bore no relation to the election contest.

In the "noon" and "home" editions of the issue of the San Antonio Evening News of August 22 the following news item appeared:

"Poll List Negatives Burn.

"Alamo Blue Print Co. Suffers Loss in Fire.

"Loss of Lists Follows Finding Ballot Boxes in Unlocked Room.

"Negatives of polling lists used in the Democratic primaries July 26 were destroyed in a mysterious fire at the Alamo Blue Print Company, 506 South Presa street, at 6:30 o'clock Friday morning.

"Only a few lists are left, according to Mr. C. R. Southwell, head of the Blue Print Company. The destroyed lists had been placed on a shelf in the stock room where the blaze originated.

"Seven hundred negatives used in making the polling lists were destroyed, Southwell says. The negatives are used in printing poll lists for the various voting precincts.

"Ballot boxes used in 13 voting precincts July 26 were found Wednesday outside the room designated for their safe-keeping by Judge S. G. Tayloe of the Forty-Fifth district court.

"They were being held by court order for use in the election contests to be tried October 6.

"The fire was discovered by a night watch-

---

⇐For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

man, and the alarm sent in about 6:30 Friday morning. Damage was confined to the stock and work room.

Several blue print maps of the city and county were destroyed along with the tax lists. A large washing and drying machine suffered most by the blaze. A large stock of chemicals also were lost.

"The motor of the washing machine was found running by firemen of the Central Station. Chief Sarran thinks it might have caused the fire.

"Southwell did not make an estimate of the damage."

And in the "night" and "baseball" editions of the same issue of the newspaper, the above, as well as the following item, appeared:

"Court to Hear of Poll List Negative Fire.

"Finding of Ballot Boxes in Unlocked Room Also to be Told Judge.

"Discovery of 13 ballot boxes in an unlocked room in the basement of the courthouse, and the loss of negatives of polling lists in a mysterious fire early Friday will be called to the attention of Judge S. G. Tayloe of the Forty-Fifth district court Monday.

"This announcement was made by D. F. Davis, one of the 'better government' candidates to file contesting suits before Judge Tayloe. When the suits were filed the court issued an order impounding all the ballot boxes in a locked room.

"Probe Blaze at Blue Print Company.

"An investigation is contemplated to determine the cause of the blaze at the Alamo Blue Print Company, where the negatives were kept, it is said.

"No action can be taken this week by the contesting candidates because of the absence from the city of their attorney, Claud J. Carter. He will return from Austin Saturday afternoon.

"Only a few of the polling lists were not damaged by fire according to C. R. Southwell, head of the Blue Print Company. The destroyed lists, he says, had been placed on a shelf in a stock room where the blaze originated.

"Can Make No Move till Carter Returns.

"'We can make no move until Carter returns,' declared Davis. 'We, of course, expect to carry both incidents to the attention of Judge Tayloe. We have decided not to withdraw our contesting suits, but will go ahead as planned.'

"Hearing on the suits is set for October 6. Among contestants were Mrs. Louise Dimaline, for government' candidate for district clerk, Bradford, candidate on the same ticket for public weigher, and D. F. Davis, candidate for judge of county criminal court."

The Evening News is a daily newspaper published in the city of San Antonio by the Express Publishing Company, a corporation, and at that time had a daily circulation of 33,166 copies. C. R. Southwell, the owner of the Blue Print Company, and mentioned in the first quoted article, subsequently brought this action against the Express Publishing Company, to recover actual and exemplary damages under allegations that said articles were libelous, and resulted in injury to him.

In a jury trial Southwell recovered judgment against the Publishing Company for $2,500 actual damages, and a like sum for punitive damages. The Publishing Company has prosecuted this appeal from that judgment. The publications were traversed by searching inquiries upon all phases of the case, propounded both in the court's main charge and in special issues requested by appellant, and all those issues were resolved against appellant.

It is conceded by appellee that the publications were not libelous per se, but it was alleged and is still contended by him that they were libelous by reason of innuendoes directed through them at appellee. The innuendoes deduced by appellee from the publications are that the fire was "mysterious"; that connected with this mystery and the consequent loss of the poll list negatives used in the recent primary election was the alleged tampering with the ballot boxes stored in the courthouse, claimed in the publication to have been ordered by Judge Tayloe to be kept under lock and key; that the poll list negatives were necessary as evidence in the election contest; that as a consequence of the mysterious fire evidence necessary in the trial of the election contest was destroyed; that the two incidents of the fire and of the tampering with ballot boxes were related, and were of such public importance that they were to be investigated under orders of Judge Tayloe and by the contesting candidates and their attorney; that there was "something unlawful or criminal about the fire occurring in appellee's place of business," and the consequent destruction of the poll list negatives; and that appellee had some "connection or part in the mysterious fire." The gist of the innuendo alleged and relied upon by appellee is that he was charged in the publication as being responsible for the fire, and his case must be tested by the cause of action so alleged.

[1] In determining if a particular publication is libelous, the language used in the publication should be given its plain and ordinary import. Its effect must be ascertained from the impression it may create in the minds of average, ordinary readers, and not from an import it may carry only to the supersensitive mind. It should not be given a strained interpretation, in order to attribute a libelous quality to it.

[2] In order to constitute a libel against a particular person, the publication must be directed at that person, either expressly or by reasonable deduction from its language or context, or both construed together, and must have the effect of injuring or tending to injure the reputation of the complaining per-

son, to the extent of exposing him to public hatred, contempt, ridicule, or financial injury, or to impeach his honesty, integrity, or virtue.                                    ,

[3] In this case the plain language was that appellee's plant was visited by a mysterious fire, which statement, since the fire was concededly of unknown origin, was substantially true. The use of the word "mysterious" may have had the effect of adding a little color to the incident, and was perhaps used to enhance the unwarranted sensationalism injected by the author into the publication. But it served no further purpose, and constituted no innuendo against appellee. The assertion, by implication, that the poll list negatives were valuable, or important, as constituting necessary evidence in the pending election contest, and the linking of their loss by fire with the tampering with the ballot boxes to be used in that contest, had no foundation in fact, but apparently was fabricated by the author for the sole purpose of giving a sensational turn to what was in fact but an insignificant incident in the daily affairs of the city. But if, in this venture into sensationalism, the liberty of the press, which is and ought to be and remain inviolate, was prostituted to the uses of license, no injury was shown to have been done appellee; the public, or unnamed members of the public, alone sustained injury. For there was no intimation, or implication, or innuendo, that appellee was interested in the election contest, or in the destruction of evidence to be used in that contest, or that he caused or connived at the fire. On the contrary, the normal inference to be drawn from the specific language, as well as from the whole context, of the publication, was that appellee could not have profited, but could only be injured, by the loss of the property destroyed in the fire.

The implication was that the fire was a part of a conspiracy upon the part of the successful candidates, or other persons interested in the late primary election, to destroy evidence necessary to the establishment of the true results of that election, and the very language of the publications excluded appellee from that class, and placed him alone in the class who sustained injury as a consequence of the fire. The statements and innuendoes in the publications, that the fire and the tampering with the ballot boxes were related incidents, and were done in furtherance of the imaginary conspiracy, and were therefore to be subjected to judicial inquiry, and to investigation by the contesting candidates and their counsel, had no other effect than to further exaggerate the assumed importance and significance of the fire, and lend additional color to the implications against those suspected of the design to destroy evidence; instead of throwing suspicion upon appellee, they rather emphasized his exclusion from the suspected class. We are unable to find that any reasonable or fair construction of the language and context of the publication gives any support to the alleged innuendo that appellee had any wrongful connection with or part in the fire, and the record conclusively refutes any charge of malice against appellant as a basis for the publication. Obviously, none of the implications of wrongdoing, no actual malice, and none of the malice to be deduced from the gross implications of wrongdoing of others, was directed at appellee, by innuendo or otherwise.

[4] It being conceded that the publication was not libelous per se, the duty rested upon the trial court to determine if the published words were capable of the meaning ascribed to them by the alleged innuendo. If in their natural meaning they were incapable of such interpretation, then it was the duty of the court to withhold the case from the jury by sustaining the general demurrer to the plaintiff's petition; if they were capable of that construction, then the court properly submitted to the jury the question of whether or not the offensive deductions alleged should be, and were in fact, drawn from the publication.

As the innuendoes attributed in appellee's pleading to the publication are not reasonably deducible therefrom, it follows that the trial court should have sustained appellant's general demurrer, and because of the error in overruling the general demurrer the judgment will be reversed and the cause remanded.