NEWSPAPERS INCORPORATED V. STANLEY B. MATTHEWS.

No. A-7183. Decided October 19, 1960.
Rehearing Overruled November 30 ,1960.
(339 S.W. 2d Series 890)

*Looney, Clark, Mathews, Thomas & Harris, Edward Clark, Charles D. Mathews, Martin Harris,* and *Mary Joe Carroll,* all of Austin, for petitioner.

*Byrd & Davis, L. Tonnett Byrd* and *Tom H. Davis,* all of Austin for respondent.

MR. JUSTICE HAMILTON delivered the opinion of the Court.

The respondent's motion for rehearing in this cause was duly considered, and is overruled. Our original opinion in this cause is, however, withdrawn, and the following substituted therefor:

The respondent, Stanley B. Matthews, sued the petitioner, Newspapers, Inc., for damages for libel to himself personally and to his business, alleged to have been published in the Austin American and the Austin Statesman, two newspapers published by petitioner. At the close of the evidence for plaintiff, respondent here, on motion of defendant, petitioner here, the trial court granted an instructed verdict for petitioner. Respondent was the owner of an automobile repair business conducted under the name of Texas Body Shop. Respondent had acquired this business, known as the Texas Body Shop, from Joe Rocha and Alex Hisbrook about two months prior to the publication of the articles complained of. Both of said former owners remained on as employees of respondent, working as metal workers and laborers, doing the same kind of work they did as owners. Darrell Cluck, who was manager for Joe Rocha and Alex Hisbrook, remained as manager for respondent. Although respondent continued to use the assumed name of Texas Body Shop, he failed to file an assumed name certificate as provided for in Article

5924, V.A.C.S. In an edition of the Austin Statesman of July 27, 1953, there appeared an article asserting that an automobile wrecking racket had been uncovered. The car wreckers reportedly were wrecking an individual's car for a fee of $50.00, then bidding on the salvage and estimating the original value concerning insurance loss. The article in full is quoted, as follows:

## "AUTOMOBILE WRECKERS UNCOVERED
### "Racket Operated to Get Insurance

"A professional car wrecking ring was busted wide open here Monday by state highway patrolmen who have long suspected certain citizens of pushing their automobiles off cliffs in an effort to cash in on insurance claims.

"The car wreckers, it is said, will 'take care' of your car for $50.

"Many being in the wrecker and junk business, they're in a fine position to bid on the salvage and estimate the original value concerning insurance loss.

"TWO HIGHWAY PATROLMEN—O. E. Lusk and W. D. Wilson—uncovered the shady operation during the past week. They've been working on the case for several months, and Lusk said Monday that 'this is only the beginning.'

"Charges have been filed on two body shop operators in connection with the case. An examining trial is scheduled for 2 p.m. Tuesday in Justice of the Peace Frank McBee's Court.

" 'We have information regarding at least five more such incidents during the past few months,' said Lusk. 'It's something we've long suspected but haven't been able to prove. There'll be many more charges due in the near future.'

"The patrolmen got their big break last week when they were called in to investigate an 'accident on the Old Manor Road near the Walnut Creek Bridge.

"There they found a 1951 Plymouth almost totally demolished. 'All the physical facts and evidence pointed to the fact that the vehicle had been intentionally wrecked,' said Lusk.

"The patrolmen talked to the car's owner who is stationed at Gary Air Force Base in San Marcos. Further questioning indicated he might not be telling the truth.

"Patrolmen said he underwent a polygraph test at the State Highway Department offices and subsequently broke down under questioning. Officers said he signed a confession stating he had entered into an agreement with the two body shop operators whereby they would wreck his car for $50.

"DURING THE PAST two months there have been cases wherein cars have rolled down steep cliffs and the drivers escaped uninjured from the demolished vehicles. Other cars have slipped off embankments, and there were several instances where autos caught fire and burned.

"Patrolmen said they had been suspicious of a local body shop for some time. Even the manager's car had rolled off a cliff on the Marble Falls highway just last month. He was uninjured, but the automobile—a 1949 Packard—was a total loss.

"And still another case involved a Bergstrom airman's car in which the driver had left the vehicle to fix a flat tire. He explained that the vehicle rolled down a nearby cliff while he tried to change tires."

The following morning the Austin American carried a related article. It also is quoted in full, as follows:

"HIGHWAY PATROL UNCOVERS PROFESSIONAL CAR-WRECKING RING

"A ring of professional car wreckers—who will guarantee to leave your vehicle in an advanced state of disrepair for a $50 fee—was uncovered in Austin Monday, State Highway Patrolmen said.

"The car wreckers who have been operating in this area, patrolmen said, have been pushing autos off cliffs, setting them on fire and otherwise destroying them to help the owners collect on their insurance claims.

"The two highway patrolmen who broke the case — O. E. Lusk, and W. D. Wilson—said some of the wreckers have been 'fronted' by wrecker and body shops. By doing this, they pointed out, they were in a good position to estimate the wrecked car's original value for the insurance companies.

"Lusk said: 'This is only the beginning. We expect more

arrests and plenty of confessions within the next few days. We've been on this for a long time.'

"Charges of conspiring with intent to swindle were filed in Justice of the Peace Frank McBee's Court last week on two Austin men in connection with the case. More charges are due this week, and an examining trial is due Tuesday at 2 p.m.

"Filed on in McBee's Court were Joe R. Rocha, and Alex Hisbrook, operators of the Texas Body Shop here.

" 'We have plenty of information regarding at least five more such incidents over the past two months,' Lusk said.

"I 'It's something we've long suspected but haven't been able to prove.'

"The patrolmen believe they can prove their point now.

"The patrolmen last week became suspicious by the way a 1951 Plymouth had been demolished after a fall from a cliff. They questioned a Gary Air Force Base airman who broke down and made a confession, the patrolmen said.

The patrolmen said a number of cars during the past few months hav etaken mysterious plunges off cliffs, into lakes, down embankments and into abutments. The drivers have always escaped unijured."

The Court of Civil Appeals, in reversing the judgment of the trial court and remanding the cause, said that there was sufficient evidence to raise a jury question as to whether the publications were aimed at appellant and his business. 319 S.W. 2d 177, 178.

The points of error assigned by petitioner raise two issues which we consider to be of merit in reaching our decision. One of the issues raised by petitioner is that libel or defamation of a business is not actionable in this jurisdiction. The other issue concerns the specificness of identification required to maintain an action for libel. We can find no authority for a right of action for defamation of a business disassociated and distinct from the defamation of its owner. Article 5430, V.A.C.S., reads:

"Art. 5430. Definitions.

"A libel is a defamation expressed in printing or writing, or by signs and pictures, or drawings tending to blacken the memory of the dead, or tending to injure the reputation of one who is alive, and thereby expose him to public hatred, contempt or ridicule, or financial injury, or to impeach the honesty, integrity, or virtue, or reputation of any one, or to publish the natural defects of any one and thereby expose such person to public hatred, ridicule, or financial injury. Acts 1901, p. 30."

■ From this definition it can be seen that the very wording of the libel statute precludes its application to a business. It does not alter the situation that a corporation may be libeled, Bell Publishing Co. v. Garret Engineering Co., 141 Texas 51, 170 S.W. 2d. 197, Restatement of the Law of Torts, Vol. 3, Sec. 561, or that a partnership may be libeled. In both instances the defamation is of the owner of the business and not of the business itself. Libelous writings, by innuendo, may tend to injure the reputation of an owner and to expose him to public hatred. Such writings may also tend to injure the owner financially through a loss or reduction in business. In each case, recovery of the two elements of damages will be for defamation of the owner, whether the owner be an individual, partnership or a corporation.

■ We hold as a matter of law that Matthews cannot recover for libel to his person in this instance for the reason that the articles refer to no person who could possibly be identified as the respondent. The respondent Matthews was not named in either of the articles. The rule in this and other jurisdictions is that the asserted libel must refer to some ascertained or ascertainable person, and that person must be the plaintiff. In 33 American Jurisprudence, 101, "Libel and Slander," Sec. 89, the rule is stated as follows:

"In order to entitle one to maintain an action for an alleged defamatory statement, it must appear that he is the person with reference to whom the statement was made."

The above rule has been consistently followed by the courts of this state. See Harris v. Santa Fe Townsite Co., 125 S.W. 77, writ refused; McCormick v. Houston Printing Co., 174 S.W. 853, writ refused; Express Publishing Co. v. Southwell, 295 S.W. 180, writ refused; Carter Publications, Inc. v. Fleming, 129 Texas 667, 106 S.W. 2d 672; Pridemore v, San Angelo Standard, 146 S.W. 2d 1048, writ dismissed, judgment correct.
■ It is likewise true, however, that it is not necessary that the

individual referred to be named if those who knew and were acquainted with the plaintiff understand from reading the publication that it referred to plaintiff. Gibler v. Houston Post Co., 310 S.W. 2d 377, refused n.r.e.; Red River Valley Publishing Co. v. Bridges, 254 S.W. 2d 854, refused n.r.e. Respondent relies solely on one statement in the second article for his identification with said articles, that is, "filed on in McBee's court were Joe R. Rocha, and Alex Hisbrook, operators of the Texas Body Shop here." The persons referred to, however, are named and negative any possibility of respondent's being identifed. The only other person referred to who could have any connection with the Texas Body Shop was the manager of a local body shop. He was positively identified as one other than the respondent Matthews.

Respondent contends that since the articles make the statement that some of the body shops have fronted for car wreckers and since the Texas Body Shop was mentioned, it is implied that the Texas Body Shop was a front for car wreckers, and that he, the respondent, was operating the shop as a front for car wreckers, and thereby was libeled. The articles in substance tell the following story: Within the last few months a number of cars have taken mysterious plunges off cliffs into lakes, down embankments and into abutments. The drivers have always escaped uninjured. Officers have suspected a professional ring of car wreckers, who wreck cars for the owners so they can collect their insurance. Officers said that some body shops have fronted for car wreckers. Charges have been filed on two body shop operators in connection with the case. The two body shop operators are Joe R. Rocha and Alex Hisbrook. They are operators of the Texas Body Shop. Respondent contends that this presents the implication that he, Matthews, as true owner and operator of the Texas Body Shop, was operating the shop as a front for Rocha and Hisbrook in their illicit activities. Such claimed implication is not consistent with the plain language of the articles. Since the articles explicitly name Rocha and Hisbrook as the operators of the shop, the full import of the articles point to them as the operators of the shop as a front for their activities, rather than to Sanley Matthews. The settled law requires that the false statement point to the plaintiff and to no one else.

For the reasons stated, we conclude that the trial court was correct in instructing a verdict for petitioner at the close of plaintiff's case. We therefore reverse the judgment of the Court of Civil Appeals and affirm that of the trial court.

Opinion delivered October 19, 1960.

MR. JUSTICE CALVERT, joined by JUSTICES WALKER AND NORVELL, dissenting.

I dissent.

The allegations of the petition on which respondent went to trial are broad enough to encompass two theories of recovery, viz: (1), a recovery of $10,000 in damages for a personal libel and of $10,000 in damages for a libel of his business; or (2), a recovery of $20,000 in damages for a personal libel — $10,000 for mental anguish suffered from being exposed to public hatred and contempt and $10,000 for financial injury suffered by loss of business.

I agree with the majority's holding that there is no such legal wrong as libel of a business as such. That holding narrows this case to the second theory of recovery.

The only reason assigned by the majority for their holding that respondent cannot recover is that the published articles do not identify him. The particular language of the majority opinion is that there can be no recovery because "the articles refer to no person who could possibly be identified as the respondent." The majority thus assume that to be libelous of a person an article must refer expressly to a person. I submit that the assumption is unsound. Defamatory statements with reference to a business which would be libelous if directed at a named individual are undoubtedly libelous of the owner of the business. If it were not so a business could be destroyed and its owner ruined financially by defamatory publications which referred only to the business by name. Let us take an example: a published article states that "the Red Dog Tavern is swindling its customers." It goes without saying that the Red Dog Tavern cannot swindle anyone and the article therefore necessarily implies that the owner of the tavern, whether the owner be a corporation, a partnership or an individual doing business under an assumed name, is operating the tavern or permitting it to be operated so as to swindle its patrons. The defamatory statement clearly identifies the owner of the business as the one who is guilty of criminal conduct and the rule requiring identification is thus fulfilled.

The majority next say that the naming of others as "operators" of respondent's business "negative any possibility of

respondent's being identified." Let us look again to our example: a published article states that "the Red Dog Tavern, operated by A. B. against whom criminal charges have been filed, is swindling its customers." Now let us suppose that the tavern is actually owned by C. D. and his ownership is known to many people in the community who, following the publication, shun his society and cease patronizing the tavern to its utter ruination. Would this court then hold that C. D. could not recover damages for mental anguish and for the loss of business because the article referred to A. B. as the operator and stated that criminal charges had been filed against him? Of course not; and it would not matter whether in referring to A. B. as "operator" the article meant "owner" or "manager," or that A. B. was in fact the manager.

What has been said here by way of example is not without support in decided cases, although admittedly not a great many such cases are to be found. Wilson v. Sun Pub. Co., 85 Wash. 503, 148 P. 774, was a suit for damages for libel by partners by the name of Wilson and Carle growing out of published articles defamatory of the Epler Cafeteria. It was urged as a defense that "the articles were not libelous in that they did not mention the name of either of the respondents." The court said: "We find no merit in this claim. * * * The articles did mention the name of that business which was unknown as the 'Epler Cafe.' By designating the name of their business, the article had just as damaging an effect upon the partnership business as if it had mentioned the names of the partners." Young v. New Mexico Broadcasting Co., 60 N.M. 475, 292 Pac. 2d 776, involved a telecast defamatory of a business owned and operated by partners, one of whom was a silent partner, known as "Day and Night Television Service." Neither of the partners was named in the telecast. It was contended that because one of the partners was a silent partner "the defamatory statements could not possibly have been directed at him, or so understood by the public." The court overruled the contention, pointing to testimony that some of those who saw and heard the telecast knew of the silent partner's connection with the business, and concluding: "In any event, libel of the trade name was libel of the partners, either of whom was entitled to maintain the action." In Brayton v. Crowell-Collier Pub. Co., 205 F. 2d 644 (U.S.C.A., 2nd Cir.) a recovery of damages for libel was affirmed in favor of one Clyde Brayton because of published articles defamatory of Brayton Flying Service, a corporation. The court pointed out that the plaintiff completely controlled the corporation and that readers of the article "under-

stood it to charge him as well as the Brayton Flying Service with the improper conduct which the article denounced."

Perhaps closest in point with the facts in the case before us is Naihaus v. Louisiana Weekly Pub. Co., 176 La. 240, 145 So. 527. The published article in that case reported that a Negro named Paul Gilbert and "the manager of the New Orleans Clothing Store participated in a verbal battle over $9.95 balance due on a suit of clothes," and continued: "According to the police officer, hardly a week goes by but the New Orleans Clothing Store is in a broil with a colored customer. Recently the manager of the place was arrested following a disturbance of a similar nature. The officer * * * expressed the desire that the Louisiana Weekly * * * warn unsuspecting negroes to beware of such sharp-dealing Rampart Street shopkeepers." Notified by the owner of the New Orleans Clothing Store that he expected to sue, the paper published a second article in which it stated that names of several witnesses had been obtained to vindicate its statement and that it was desirous of having the names of as many people as possible "who have been mistreated by purchasing at the New Orleans Clothing Store." Naihaus, owner of the store, recovered a judgment based on libel. From the court's opinion I take the following excerpt:

"It is argued for the appellant that the plaintiff could not have suffered any injury to his name or reputation, because his name was not mentioned in either of the publications. It was well known in the neighborhood, however, that the plaintiff, Carl Naihaus, was the proprietor of the New Orleans Clothing Store, the advertising matter or business cards of which establishment bore his name as proprietor. That is a matter of little or no importance, because the principal injury done by the publications complained of was done to the business, of which the plaintiff was the proprietor."

The libel made the basis of respondent's suit is implied from statements contained in the two articles quoted in the majority opinion. Respondent alleged in his petition that "the two articles, taken together, reasonably led the general public to believe that the Texas Body Shop, plaintiff's business, was a front for a professional car-wrecking ring." I agree that this is a reasonable implication which a jury would have a right to draw from the following statements of fact contained in the articles: 1. A ring of professional car wreckers has been operating in Austin. 2. Some of the wreckers have been "fronted" by wrecker and body shops. 3. Patrolmen have been suspicious of a local body

shop for some time. 4. Charges of conspiring with intent to swindle have been filed on Joe R. Rocha and Alex Hisbrook, "operators of the Texas Body Shop here."

Respondent was correct, of course, in testifying that he was identified in the articles only by the reference to the Texas Body Shop. That was the only body shop named in the articles, however, and the innuendo is therefore clear that Texas Body Shop was the one of which patrolmen had been suspicious for some time and the one which had been fronting for some of the professional car-wrecking swindlers. To make such a charge against the business by name is to make it in law against the owner, just as was held in the cases analyzed above, and we have been cited to no cases, and have found none, holding to the contrary. It matters not that the articles referred to charges being filed against Rocha and Hisbrook, "operators" of the business. In *Naihaus,* supra, it was expressly stated that the "manager" of New Orleans Clothing Store had been arrested. The important consideration is that there is testimony in the record before us that people acquainted with respondent and with his ownership of Texas Body Shop were led by the articles to believe that he was involved in illegal activities and as a result his business was wrecked. In other words there is evidence in the record, much of which is detailed in the opinion of the Court of Civil Appeals, which entitled respondent to go to the jury on both elements of damages for which he sued.

I respectfully submit that the reason which the majority now give for upholding the instructed verdict against respondent is unsound. Since the majority do not write on the other questions presented, I see no need to do so in this dissent. Suffice it to say that I am convinced that the trial court erred in giving an instructed verdict and I would affirm the judgment of the Court of Civil Appeals.

Opinion delivered November 30, 1960.

Rehearing overruled November 30, 1960.