Ronald J. LEE and Luella J. Lee,
Plaintiffs-Appellants,

v.

Lonnie G. WESTON, Defendant-Appellee.

No. 2–778–A–233.

Court of Appeals of Indiana,
Fourth District.

March 26, 1980.

John T. Manning, Warsau, Wis., for plaintiffs-appellants.

Fred G. Yelton, Jr., Anderson, for defendant-appellee.

MILLER, Presiding Judge.

Plaintiff-appellants Ronald I. Lee and Luella J. Lee (Lees) husband and wife, brought suit against Lonnie G. Weston (Weston), the Coroner of Madison County, in a two-paragraph complaint. The first paragraph alleged Weston had improperly ordered an autopsy of their 18-year old son, Randall, and then interfered with the autopsy by causing his body to be partially embalmed prior to the autopsy. The second paragraph alleged Weston libeled the Lees by finding in his verdict that the cause of Randall's death was "Aspirations of body content/Due to overdose", a cause they claim was not substantiated by medical evidence. The trial court granted summary judgment against the Lees and they appeal claiming genuine issues of fact remain on both their theories of recovery.

We affirm.

On November 27, 1974, Randall E. Lee was found dead on the floor of a friend's apartment in Alexandria, Indiana. He was lying on his back with his head on a pillow. Vomit covered the pillow, his nose and mouth. A virtually empty fifth of whiskey was found in the apartment. The record does not reflect how (or by whom) the body was discovered. Weston, a funeral home director who was also the Madison County Coroner, was called to the scene and arrived at approximately 11:30 a. m. Weston estimated the time of death at 9:00 a. m., November 27, 1974 based on the absence of rigor mortis and the temperature of the corpse. He ordered the body removed to the Kyle Funeral Home pending an autopsy. Weston requested Michael Owens, the manager of Kyle Funeral Home, to contact the Lee family as to the funeral arrangements. Owens contacted the Lees, who requested Owens to handle the arrangements at the Kyle Funeral Home. Upon returning to the funeral home, Owens directed Albert Kirby, a Kyle employee, to proceed with the preliminary embalming. Kirby fixed the facial features, drained the majority of the blood from the body and replaced it with a preservative (formaldehyde) and cleaned the body and hair. An autopsy was performed later that day by Dr. Jerry Stevenson at St. John's Hospital in Anderson, Indiana. Following the autopsy, Weston formally listed his verdict on the cause of death as "Aspiration of body content/Due to overdose," though Weston admitted in his deposition he had reached this conclusion prior to the autopsy. The Lees filed the suit against Weston on November 29, 1976.

First, we note our appellate responsibility in reviewing the grant of a summary judgment. This Court must determine whether the trial court correctly applied the law and whether there remains a genuine issue of material fact. Ind. Rules of Procedure, Trial Rule 56; *Johnson v. Wabash County*, (1979) Ind.App., 391 N.E.2d 1139; *Tekulve v. Turner*, (1979) Ind. App., 391 N.E.2d 673. A fact is material where its resolution is decisive of the action or of a relevant secondary issue. *Johnson v. Wabash County, supra.* The movant carries the burden of establishing the absence of a factual controversy and the evidentiary matters will be construed in a light most favorable to the nonmoving party. *Tekulve v. Turner, supra.* Thus, summary judgment "is a procedure for applying the law to the facts when no factual controversy exists." *Central Realty, Inc. v. Hillman's Equipment, Inc.*, (1969) 253 Ind. 48, 246 N.E.2d 383, 389. With these principles in mind we now address the issues presented by this appeal.

*THE AUTOPSY*

Randall was only 18 years old at the time of his death. He was found in a friend's apartment surrounded and covered by his own vomit. Weston, as County Coroner, was called to investigate the death by the Alexandria Fire Department. Weston's jurisdiction properly arose in this instance because Randall's death occurred when he was "in apparent good health" and in a "suspicious, unusual or unnatural manner." Ind.Code 17–3–17–4(a). Once jurisdiction is assumed, a coroner, in the furtherance of his inquiry, has virtually an unlimited prerogative to order an autopsy under Ind. Code 17–3–17–4(c):

Whenever any coroner under this act deems it necessary in the discharge of his duties to have an autopsy performed he shall employ a physician possessing the education and training that meet the standards established by the American Board of Pathology for certification or a physician holding an unlimited license to practice medicine in Indiana acting under the direction of such qualified physician to perform such autopsy, for which such physician shall be paid from the county treasury a fee of not less than fifty dollars [$50.00].

See *Stath v. Williams*, (1977) Ind.App., 367 N.E.2d 1120, 1124. After examining the numerous depositions and the pleadings, we find no evidence of bad faith,[1] or maliciousness on Weston's part in ordering the autopsy under these circumstances. Ind.Code § 17–3–17–15 provides immunity to Weston for ordering the autopsy. This statute reads:

All persons who in good faith order or perform medical examinations and autopsies pursuant to the laws of this State shall be granted immunity from civil suits for damages in ordering or performing such medical examinations or autopsies.

Further, the Lees admitted in their brief and on oral argument that Weston was justified in ordering the autopsy initially.

 However, the Lees assert Weston was either responsible for or aware of the preliminary embalming, a process which they contend destroyed or at least altered any results which might have been obtained from the autopsy, making the postmortem useless and unnecessary and thus ordered in bad faith. See Snyder, *Justice and Sudden Death*, 36 *J. of Am.Jud. Soc'y.*, 142, 144–45 (1953); Helpern, *The Postmortem Examination In Cases of Suspected Homicide*, 36 J.Crim.L. & C. 485, 502–503 (1945–46); Note, *Vitalization of the Indiana Coroner System—Chaneling Medico—Legal Duties to the Technically Trained*, 31 Ind.L.J. 296, 301 (1956). Again, the record does not support the Lees' allegation. Regardless of whether or not preliminary embalming impedes autopsy findings, there is no evidence that Weston knew preliminary embalming would or had taken place. Several depositions show Weston ordered the autopsy prior to the removal of Randy's body from the apartment to the funeral home. Weston gave no other instructions concerning preparation of the body other than to request Michael Owens to contact the Lees as to their wishes concerning funeral arrangements. Thereafter, Weston had no contact with the body. There was a total absence of evidence that Weston knew of the preliminary embalming.

The function of the material filed in support of a motion for summary judgment is to enable "the court, by piercing the pleadings, to establish the existence, or conversely, the non-existence of a genuine issue of fact." *Pan American World Airways, Inc. v. Local Readers Service, Inc.*, (1968) 143 Ind.App. 370, 240 N.E.2d 552, 555. Here, Weston sustained his burden of showing he was not responsible for the partial embalmment of Randall's body prior to autopsy, a fact which the Lees would have to prove otherwise in order to sustain their alleged cause of action. The burden then rested on the Lees to demonstrate the existence of a genuine triable issue through affidavits, depositions, answers to interrogatories, admissions and/or testimony. *Renn v. Davidson's Southport Lumber Co., Inc.*, (1973) 157 Ind.App. 446, 300 N.E.2d 682; *Doe v. Barnett*, (1969) 145 Ind.App. 542, 251 N.E.2d 688. This they failed to do. In effect, they rested on their pleading contrary to Ind. Rules of Procedure, Trial Rule 56(E) which provides:

. . . . When a motion for a summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in

---

1. 'Bad faith' is not simply bad judgment or negligence, rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity. It is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will. *Stath v. Williams, supra* at 1124.

this rule, must set forth specific facts showing that there is a genuine issue for trial. . . .

The trial court properly granted summary judgment as to the first paragraph of Lees' complaint.

### ISSUE TWO

In their second paragraph of complaint, the Lees allege that by virtue of the coroner's verdict of death by "Aspiration of body content/Due to overdose" both the memory of their son and they were defamed and as a consequence they underwent "extreme outrage and great emotional stress and anguish and . . . suffered physical and psychical illness", all to their damage. They claim in their brief that, since Randall lived with them and was dependent on them for support and care, implying he died of a drug overdose was "a direct smirch on them, as their son had not achieved the emancipation which would have made him a separate and sole entity of his own for society's purposes". Because of the close domestic relationship between them and their dead son they claim the three were necessarily identified in the minds of those who knew them or knew of them and, therefore, their reputations and character in the eyes of others suffered by virtue of the verdict. However, they are unable to cite any authority in support of their position and we must reject it.

The applicable rule concerning whether one can sue for the defamation of a deceased relative is concisely stated in 50 Am. Jur.2d Libel & Slander § 320 (1970):

Although a right of action for damages for defamation of a deceased person existed under the Roman law, and still exists in some jurisdictions which adhere to the civil law, it is established that defamation of a deceased person does not give rise to a right of action at common law in favor of the surviving spouse, family, or relatives who are not defamed. And this is the rule notwithstanding the fact that the commonly accepted definition of libel includes, as one form thereof, publications tending to blacken the memory of the dead. Moreover, a libel and slander upon the memory of a deceased person which does not directly reflect upon the deceased's relatives, or upon his former associates, gives them no cause of action for libel, in their own right, upon the ground that the defamation tended to subject them to ridicule or contempt. See 53 C.J.S. Libel and Slander § 145 (1948).

Professor Prosser states:

Any living person may be defamed. The civil action is personal to the plaintiff, and cannot be founded on the defamation of another; but it is of course possible that two persons may stand in such a relation that defamation of one will be found to reflect upon the reputation of the other—as where, for example, it is said that the plaintiff's mother was not married to his father; and where such is the case, the plaintiff may have an action in his own right. Likewise, no civil action will lie for the defamation of one who is dead, unless there is a reflection upon those still living, who are themselves defamed. Statutes in several states have made defamation of the dead a crime, but they have been construed as intended only to protect the public interest and the memory of the deceased, and so to afford no civil action to the surviving relatives.

*W. Prosser, Law of Torts*, § 111 at 744–45 (4th ed. 1971).

The question raised in this appeal appears to be one of first impression in this State. However, based on the overwhelming authority of other jurisdictions we hold that, even assuming without deciding that the coroner's verdict defamed the Lees' son, it appears as a matter of law from pleadings and depositions before the trial court that the coroner's verdict did not create a cause of action on behalf of the Lees.

When a party has claimed injury to his own reputation based on the defamation of a deceased relative, courts of other jurisdictions have denied liability on one or more of several theories:

. . . . (1) that to grant a right of action is inconsistent with traditional theories of success on one's own merits; (2) that there is no means of determining what degree of consanguinity should serve to demark those relatives who should be given a right to sue from those who should not be, and, consequently, the defendant might be subjected to a multiplicity of suits; (3) that the right, if granted to relatives when the person particularly referred to in the defamatory remarks is dead, would have to be granted to his relatives while he is alive; (4) that to permit the action would be to hamper historical research; (5) finally, the objection apparently entertained by the majority in the instant case, that one person cannot sue for the defamation of another.

40 Colum.L.Rev. 1267, at 1268–69 (1940).

Cases from our sister states amply illustrate the reasons why the Lees must be denied relief here. In the oft cited case of *Hughes v. New England Newspaper Publishing Company*, (1942) 312 Mass. 178, 43 N.E.2d 657, 658–59, the newspaper's article falsely stated the plaintiff's deceased husband had committed suicide (a crime in the Commonwealth of Massachusetts) pursuant to an arrangement with two of his business associates and further noted that the deceased had lived with his wife and two children. The wife brought an action for libel and damage to her reputation and the Court affirmed the trial court's action in holding the wife had no cause of action. The Court stated:

> One who defames the memory of the dead, whatever his responsibility may be under the criminal law, *Commonwealth v. Clap*, 4 Mass. 163, 3 Am.Dec. 212; *The King v. Topham*, 4 T.R. 126; *State v. Haffer*, 94 Wash. 136, 162 P. 45, L.R.A. 1917C, 610, Ann.Cas. 1917E, 229, is not liable civilly to the estate of the decedent or to his relatives. *The general rule is that a libel upon the memory of a deceased person that does not directly cast any personal reflection upon his relatives does not give them any right of action, although they may have thereby suffered mental anguish or sustained an impairment of their social standing among a considerable class of respectable people of the community in which they live by the disclosure that they were related to the deceased.*

. . . . .

The false statement that Hughes committed suicide and left a widow did not constitute a libel on the latter. That statement, which was entirely directed against Hughes, charged him with having committed suicide in accordance with an agreement with his business associates, and clearly implied that no one else had any connection with his death. His widow was not charged with any wrongdoing or with any connection with her husband's act. There are instances where the publication of a written statement concerning one person is of such a nature that it imports misconduct upon the part of another. To publish that a third person is an illegitimate child or that he is the husband of a faithless wife or that a married man is single and about to be married imputes immorality to the mother or wife. *Vicars v. Worth*, 1 Strange, 471; *Cassidy v. Daily-Mirror Newspapers, Ltd.*, (1929) 2 K.B. 331; *Shelby v. Sun Printing & Publishing Association*, 38 Hun 474; *Hall v. Huffman*, 159 Ky. 72, 166 S.W. 770; *McDavid v. Houston Chronicle Printing Co.*, Tex.Civ.App., 146 S.W. 252. Am.Law Inst. Restatement; Torts, § 564, comment e. This principle is not applicable where, as here, the natural effect of the mere statement that the husband took his own life would not cast any aspersion upon his widow.

. . . . .

The article no doubt focused public attention upon the plaintiff and caused her some embarrassment and mental anguish, and while these may be taken into account where the plaintiff has a cause of action, they do not alone furnish any foundation for recovery, because the only basis upon which an action for defamation may be grounded is damage to one's

reputation. (Citations omitted) The only harm that the plaintiff sustained from the publication arose entirely from the statements about her deceased husband and not from anything published concerning her. At most it disclosed merely her marital relationship to one who was falsely accused of having committed suicide. A wife has no cause of action for libel on account of a publication that did nothing more than state that her husband took his own life. (emphasis added).

Similarly in *Insull v. New York World-Telegram Corporation*, (1959) 172 F.Supp. 615, 636 (N.D.Ill.E.D.), aff'd. 273 F.2d 166 (7th Cir. 1959), cert. den. 362 U.S. 942, 80 S.Ct. 807, 4 L.Ed.2d 770, where alleged libels were directed against the plaintiff's father, the Court held:

A cause of action for libel accrues only to the person against whom the injurious publication was directed. [citations omitted] The tort of libel is not susceptible of fragmentation, with the wrong done one and the damage done another. That plaintiff may have been affected by the libel of his deceased father does not of itself imply an independent right of action on which he may now sue. See *Saucer v. Giroux*, 54 Cal.App. 732, 202 P. 887, 888; *Bradt v. New Nonpareil Co.*, 108 Iowa 449, 79 N.W. 122, 45 L.R.A. 681; *Hughes v. New England Newspaper Pub. Co.*, 312 Mass. 178, 43 N.E.2d 657; *Rose v. Daily Mirror, Inc.*, 284 N.Y. 335, 31 N.E.2d 182, 132 A.L.R. 888; *Sorenson v. Balaban*, 11 App.Div. 164, 42 N.Y.S. 654, 656–657; *Turner v. Crime Detective*, D.C. N.D.Okl., 34 F.Supp. 8; *Renfro Drug Co. v. Lawson*, 138 Tex. 434, 160 S.W.2d 246, 249–250, 146 A.L.R. 732. See, also, 3 Restatement, Torts, § 560; 1 Harper and James, The Law of Torts 360; Newell, Slander and Libel 368 (4th ed.); Odgers, Libel and Slander 21 (6th ed.); 53 C.J.S. Libel and Slander, §§ 11 and 145; 33 Am.Jur., Libel and Slander, § 7; 146 A.L.R. 739, 740.

*Skrocki v. Stahl*, (1910) 14 Cal.App. 1, 110 P. 957, 959, involved a newspaper article claiming a brother of the plaintiff had committed suicide, with his suicide note revealing that racetrack and slot machine activities were the reasons for ending his life. Further, the article stated the deceased was an anarchist. The Court rejected plaintiff's libel claim as follows:

"As a matter of sound public policy, the malicious defamation of the memory of the dead is condemned as an affront to the general sentiments of morality and decency, and the interests of society demand its punishment through the criminal courts, but the law does not contemplate the offense as causing any special damage to another individual, though related to the deceased, and therefore it cannot be made the basis for recovery in a civil action. This probably is a necessary incident to the theory of the social relations entertained here where one is supposed to stand or fall upon his own merits, and where success or failure is entirely independent of the accidents of rank or family connection. It necessarily follows that, theoretically, at least, no man's success can be aided or retarded by the character of his relative. The defamation of such character, therefore, however grievous or disturbing, can afford no injury that can be measured by a pecuniary standard."

In *Kelly v. Johnson Publishing Company*, (1958) 160 Cal.App.2d 718, 325 P.2d 659, 664, the deceased's sisters brought an action for libel claiming that the publication of the offending newspaper article included the false statement that their brother "wound up a dope-sodden derelict on the shadowy San Francisco waterfront where one morning his knife-scarred body was fished from the bay". The Court held this language not to constitute a libel on the sisters, stating:

The article did not make reference to plaintiffs in any way; it was not of or concerning plaintiffs. The specific allegation is that the publication was "of and concerning the said Cecil Lewis Thompson." The false statement . . . did not constitute a libel on his sisters. The publication did not expressly or impliedly cast any personal reflection on them.

The fact that the article was false as to Thompson does not operate to give plaintiffs a right of action. *Hughes v. New England Newspaper Pub. Co.*, 312 Mass. 178, 43 N.E.2d 657, 658. Plaintiffs were not charged with any misconduct or wrongdoing, or with any connection with Thompson's habits, status, or death. The article was not directed against plaintiffs and did not tend to expose them to hatred, contempt, ridicule, or obloquy.[2]

In *Gonzales v. Times Herald Printing Company*, (1974) Tex.Civ.App. (Dallas), 513 S.W.2d 124, 126, plaintiff alleged she was libeled and her reputation damaged by the newspaper's publication of two articles which reported the discovery of her husband's burned body, noting it had been found in a section of the city where other deaths had occurred in connection with a so-called heroin mini-war and implying the death might have been the result of a power struggle going on over control of heroin supplies in the City. The article also mentioned the plaintiff had confirmed her husband was missing. The Court affirmed the summary judgment entered by the trial court, concluding:

> We see nothing in either of the articles that could ordinarily be construed to reflect on plaintiff's name, reputation or character. As stated above, the only reference to her in either article was a statement that she had confirmed the fact that her husband was missing. Even if an ordinary reader might have drawn the inference that plaintiff's husband was engaged in the importation or sale of narcotics, nothing in the articles suggests that she was so engaged. Unless she herself was the particular person with reference to whom defamatory statements were made, she has no cause of action. *Keys v. Interstate Circuit, Inc.*, 468 S.W.2d 485 (Tex.Civ.App.—Tyler 1971, writ dismd.); *Newspapers, Inc. v. Matthews*, 161 Tex. 284, 339 S.W.2d 890 (1960); 50 Am.Jur.2d Libel and Slander § 143, at 645 (1970). Accord, *Rose v. Daily Mirror, Inc.*, 284 N.Y. 335, 31 N.E.2d 182, rehearing denied, 285 N.Y. 616, 33 N.E.2d 548 (1940), where the newspaper article published by defendant erroneously described the deceased as a self-confessed murder, and named the plaintiffs as his surviving wife and children, and it was held that no cause of action was stated."

Recently, a claim similar to the one before us was summarily rejected by the Court in *Casamasina v. Worcester Telegram & Gazette, Inc.*, (1974) 2 Mass.App. 801, 307 N.E.2d 865, 866. In this case, the deceased's daughter was killed in an automobile accident and the county medical examiner stated to the press that she "had a long history of involvement with drugs." The newspaper article complained of, without giving the daughter's name or making any reference to the plaintiff father, included the above quoted statement of the medical examiner. In the libel action brought against both the newspaper and the medical examiner, the Court stated the following with respect to liability based on libel:

> One who defames the memory of the dead is not liable civilly to the estate of the decedent or his relatives. The plaintiff's allegations are inapplicable to any recognized exception to this rule.

Returning to the case before us, we can find no reference, directly or indirectly, to the Lees in the coroner's verdict. They were not connected with his death nor with

---

2. In arriving at its conclusion, the Court considered it appropriate to quote the following language from *Kelley v. Post Publishing Company*, (1951) 327 Mass. 275, 98 N.E.2d 286, 287, an action by parents claiming a violation of their right of privacy by the publication of a picture of their dead daughter:

> The law does not provide a remedy for every annoyance that occurs in everyday life. Many things which are distressing or may be lacking in propriety or good taste are not actionable. Moreover, if the parents had a cause of action in a case like the present there would seem to be no reason why other members of the immediate family, the brothers and sisters, whose sensibilities may also have been wounded should not also be permitted to sue. The only reference to the plaintiffs was that the girl whose body appeared in the photograph was their daughter. This can hardly be said to interfere with their privacy.

the cause for it. It did not reflect upon their reputation or character by exposing them to ridicule or disgrace. The Lees undoubtedly suffered great mental anguish and distress as a result of the sudden and tragic death of their son. However, Weston did not defame them by his conclusion as to the cause of death and his verdict does not provide them a cause of action. "Defamatory words are not actionable unless they refer to some ascertained or ascertainable person, and that person must be the plaintiff." 18 I.L.E. *Libel & Slander* § 13; *Doan v. Kelley*, (1889) 121 Ind. 413, 23 N.E. 266; *Prosser v. Callis*, (1889) 117 Ind. 105, 19 N.E. 735; *Smawley v. Stark*, (1857) 9 Ind. 386; *Bidwell v. Rademacher*, (1894) 11 Ind.App. 218, 38 N.E. 879.

Strangely, the parties have not directed our attention to *Ind.Code* 34–1–5–1, a statute relating to actions for libel and slander, which provides:

> In an action for libel and slander it shall be sufficient to state generally that the defamatory matter published or spoken was of the plaintiff; and if the allegation be denied, the plaintiff must prove on the trial the facts, showing that the defamatory matter was published or spoken of him.

The above language refers to the defamatory matter being published of the plaintiff. *Bidwell v. Rademacher, supra.* No mention is made of the right of relatives to recover and the statute cannot be relied upon to provide relief for the Lees herein.

The trial court correctly granted summary judgment on the second paragraph of complaint.

The judgment of the trial court is affirmed.

YOUNG and CHIPMAN, JJ., concur.