190 S.W.3d 204 (2006)
HARVEST HOUSE PUBLISHERS, John Ankerberg, and John Weldon, Appellants,
v.
THE LOCAL CHURCH, An Unincorporated Association; Living Stream Ministry, A California Non-Profit Corporation; The Church in Houston, A Texas Non-Profit Corporation, The Church in Arlington, A Texas Non-Profit Corporation; Church in Beaumont, A Texas Non-Profit Corporation; The Church in Corpus Christi, A Texas Non-Profit Corporation; The Church in Dallas, Inc., A Texas Non-Profit Corporation; Church in Denton, Inc., A Texas Non-Profit Corporation; The Local Church in El Paso, A Texas Non-Profit Corporation; The Church in Fort Worth, Inc., A Texas Non-Profit Corporation; The Church in Huntsville, Inc., A Texas Non-Profit Corporation; The Church in Plano, *205 A Texas Non-Profit Corporation; Church in Odessa A Texas Non-Profit Corporation; The Church in Richardson, A Texas Non-Profit Corporation; The Church in San Antonio, Inc., A Texas Non-Profit Corporation; The Church in Texarkana A Texas Non-Profit Corporation; The Church in Tyler, A Texas Non-Profit Corporation; The Church in Fort Stockton, A Texas Non-Profit Corporation; Church in Laredo, A Texas Non-Profit Corporation; Church in Albuquerque, A New Mexico Non-Profit Corporation; The Church in Anaheim, A California Non-Profit Corporation; The Church in Arcadia, A California Non-Profit Corporation; The Church in Cerritos, A California Non-Profit Corporation; The Church in Atlanta, Inc., A Georgia Non-Profit Corporation; The Church in Baton Rouge, Inc., A Louisiana Non-Profit Corporation; Church in Bellevue, A Washington Non-Profit Corporation; The Church in Bellingham, A Washington Non-Profit Corporation; The Church in Berkeley, The Church in Birmingham, An Alabama Non-Profit Corporation; Church in Boca Raton, Inc., A Florida Non-Profit Corporation; The Church in Boise, An Idaho Non-Profit Corporation; The Church in Cambridge, Inc., A Massachusetts Non-Profit Corporation; The Church in Cary, A North Carolina Non-Profit Corporation; The Church in Chula Vista, A California Non-Profit Corporation; The Church in College Park, A Maryland Non-Profit Corporation; The Church in Cyupress, A California Non-Profit Corporation; The Church in Davis, A California Non-Profit Corporation; The Church in Diamond Bar, A California Non-Profit Corporation; The Church in Dunn Loring, A Virginia Non-Profit Corporation; Church in El Monte, A California Non-Profit Corporation; The Church in Eugene, An Oregon Non-Profit Corporation; The Church in Fairborn, An Ohio Non-Profit Corporation; The Church in Fresno, Inc., A California Non-Profit Corporation; The Church in Fullerton Corporation, A California Non-Profit Corporation; The Church in Huntington Beach, A California Non-Profit Corporation; Church in Irvine, Inc., A California Non-Profit Corporation; Church in Jackson, A Mississippi Non-Profit Corporation; The Church in Jacksonville, Inc., A Florida Non-Profit Corporation; The Church in Kansas City, Inc., A Missouri Non-Profit Corporation; The Church in Lafayette, A Louisiana Non-Profit Corporation; The Church in Little Rock, An Arkansas Non-Profit Corporation; The Church in Long Beach, A California Non-Profit Corporation; Church in Los Angeles, A California Non-Profit Corporation; The Church in Memphis, A Tennessee Non-Profit Corporation; The Church in Miami, Inc., A Florida Non-Profit Corporation; Church in Milwaukee, A Wisconsin Non-Profit Corporation; The Church in Mission Viejo, Inc., A California Non-Profit Corporation; The Church in Montebello, A California Non-Profit Corporation; Church in Monterey Park, A California Non-Profit Corporation; The Church in Moreno Valley, A California Non-Profit Corporation; The Church in Nashville, A Tennessee Non-Profit Corporation; The Church in Newington, Inc., A Connecticut Non-Profit Corporation; The Church in North Providence, A Rhode Island Non-Profit Corporation; The Church in Nutley, A New Jersey Corporation; The Church in Oklahoma City, Inc., An Oklahoma Non-Profit Corporation; *206 The Church in Orlando, A Florida Non-Profit Corporation; The Church in Palatine, An Illinois Non-Profit Corporation; Church of God Whish is at Philadelphia, A Pennsylvania Non-Profit Corporation; The Church in Pleasant Hill, A California Non-Profit Corporation; Church in Portland, An Oregon Non-Profit Corporation; The Church in Pullman, A Washington Non-Profit Corporation; The Local Church in Raleigh, A North Carolina Non-Profit Corporation; The Church in Redding, A California Non-Profit Corporation; The Church in Riverside, A California Non-Profit Corporation; Church in Roseville, A California Non-Profit Corporation; The Church in Sacramento, A California Non-Profit Corporation; The Church in Salt Lake City, A Utah Non-Profit Corporation; Church in San Diego, A California Non-Profit Corporation; The Church in San Francisco, Inc., A California Non-Profit Corporation; Assembly of the San Gabriellers, A California Non-Profit Corporation; The Church in San Jose, A California Non-Profit Corporation; The Church in Santa Clara, A California Non-Profit Corporation; The Church in Santa Clarita, A California Non-Profit Corporation; The Church in Seattle, A Washington Non-Profit Corporation; Church in Shreveport, A Louisiana Non-Profit Corporation; The Church in Spokane, A Washington Non-Profit Corporation; The Church in Streamwood, An Illinois Non-Profit Corporation; The Church in Tacoma, A Washington Non-Profit Corporation; The Church in Tampa, Inc., A Florida Non-Profit Corporation; Church in Tempe, Inc., An Arizona Non-Profit Corporation; The Church in Thousand Oaks, A California Non-Profit Corporation; The Church in Torrance, A California Non-Profit Corporation; The Church in Tucson, Inc., An Arizona Non-Profit Corporation; Church in Tulsa, An Oklahoma Non-Profit Corporation; The Church in Victorville, A California Non-Profit Corporation; The Church in Vista, A California Non-Profit Corporation; The Church in Wichita, Inc., A Kansas Non-Profit Corporation; Church in Yorba Linda, A California Non-Profit Corporation, Appellees.
No. 01-04-00231-CV.
Court of Appeals of Texas, Houston (1st Dist.).
January 5, 2006.
Rehearing Denied May 18, 2006.
*208 Lynne Liberato, for Harvest House Publishers et al.
J. Shelby Sharpe and Thomas J. Williams, for Donald D. Jackson.
*209 Douglas M. Selwyn and Craig Trively Enoch, for The Local Church et al.
Panel consists of Chief Justice RADACK and Justices ALCALA and BLAND.

OPINION
SHERRY RADACK, Chief Justice.
This is a libel suit brought by a church against a publisher and two authors after the church was included in a book about "religious cults," as that term is defined in the book. The publisher and authors moved for summary judgment, which the trial court denied. This interlocutory appeal followed. See TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(b) (Vernon Supp.2005). Because we agree that the passages in the book that refer to the church are not, as a matter of law, defamatory, we reverse the judgment of the trial court and render judgment that the church take nothing from the publisher and authors.

BACKGROUND

A. An Overview of the Encyclopedia of Cults and New Religions

John Weldon and John Ankerberg ["the authors"] wrote a book entitled Encyclopedia of Cults and New Religions ["the book"], which was published by Harvest House Publishers ["the publisher"]. The book is 700 pages long. It begins with a section entitled "How to Use this Book," which is followed by a 16-page Introduction, 57 separate chapters that describe various religious groups, including a chapter on appellees, The Local Churches and Living Stream Ministry [collectively, "the church"], and concludes with a 66-page section entitled, "Doctrinal Appendix."
The church is not named at all in the Introduction. The chapter on the church is 1 and 1/4 pages long. Living Stream Ministry, the publishing voice of the church, is mentioned once in the chapter.
The Doctrinal Appendix mentions the church twice and Living Stream Ministry once. The first mention of the church is in a chart with 15 other religious groups under the title "Different Concepts of God." The church is next mentioned in a list of 50 other religious groups under the subcategory "Religions, Cults, and the Deity of Christ." Living Stream Ministry is mentioned in a footnote, as the source of a quote from one of the church's founders.

PROPRIETY OF TRIAL COURT'S DENIAL OF SUMMARY JUDGMENT
The authors and publisher moved for a traditional summary judgment, contending that (1) the language of the book is not legally capable of any defamatory meaning, (2) the allegedly defamatory statements were not made with "actual malice," and (3) the statements were protected by the free speech and press provisions of the United States and Texas Constitutions.[1]

A. Standard of Review
When reviewing the denial of summary judgment, we apply the same well-known standards applicable to the granting of summary judgment. See Associated Press v. Cook, 17 S.W.3d 447, 451 (Tex.App.-Houston [1st Dist.] 2000, no pet.). For their traditional summary judgment motion, the authors and publisher had the burden to show that no genuine issue of material fact existed and that they were entitled to judgment as a matter of law. See TEX.R. Civ. P. 166a(c); Swilley v. Hughes, 488 S.W.2d 64, 67 (Tex.1972). A *210 defendant who conclusively negates at least one of the essential elements of a cause of action is entitled to summary judgment on that cause of action. Swilley, 488 S.W.2d at 67. Likewise, a defendant who conclusively establishes each element of an affirmative defense is entitled to summary judgment. Id. Once the movant has established a right to a summary judgment, the burden shifts to the nonmovant. Marchal v. Webb, 859 S.W.2d 408, 412 (Tex.App.-Houston [1st Dist.] 1993, writ denied). The nonmovant must respond to the motion for summary judgment and present to the trial court any issues that would preclude summary judgment. City of Houston v. Clear Creek Basin Auth., 589 S.W.2d 671, 678 (Tex.1979); Marchal, 859 S.W.2d at 412. The summary judgment should be granted if any of the theories advanced in the motion for summary judgment is meritorious. See Cincinnati Life Ins. Co. v. Cates, 927 S.W.2d 623, 626 (Tex.1996).

B. Is the Language of the Book Defamatory as to the Church?
In their first issue on appeal, the publisher and authors contend that the language of the book cannot, as a matter of law, be defamatory. To maintain a cause of action for defamation, the plaintiff must prove that the defendant (1) published a statement (2) that was defamatory concerning the plaintiff (3) while acting with either actual malice, if the plaintiff was a public figure, or negligence, if the plaintiff was a private individual, regarding the truth of the statement. WFAA-TV, Inc. v. McLemore, 978 S.W.2d 568, 571 (Tex.1998). Whether a publication is capable of being defamatory is initially a question of law to be determined by the court. Turner v. KTRK Television, Inc., 38 S.W.3d 103, 114 (Tex.2000). To make this determination, the trial court should consider whether the words used are reasonably capable of defamatory meaning by considering the allegedly defamatory statement as a whole. See Musser v. Smith Protective Servs., Inc., 723 S.W.2d 653, 654-55 (Tex.1987). The determination is based on how a person of ordinary intelligence would perceive the entire statement. See also Bentley v. Bunton, 94 S.W.3d 561, 579 (Tex.2002). This question is submitted to a jury only if the contested language is ambiguous or of doubtful import. See Denton Pub. Co. v. Boyd, 460 S.W.2d 881, 884 (Tex.1970).

1. Is the Introduction Defamatory?
The church claims that it has been defamed by certain references made in the book's Introduction. Specifically, paragraphs 15-17 of the church's petition allege:
15. Within one year of the date of this Complaint, defendant published the Encyclopedia. The Encyclopedia consists primarily of descriptions of various religious organizations identified by the authors as cults. Preceding these descriptions is a lengthy, introductory section which informs the readers that, all of "the groups contained herein deserve the title" "cult." Under a subheading entitled "Characteristics of Cults," the introduction offers the reader a numbered list of negative attributes that the authors attribute to the "cults" described in the text. The introduction also includes many other statements attributing misdeeds and other approbations to the groups listed in the Encyclopedia.

16. Among other things, the Encyclopedia's introduction specifically attributes to "cults" and therefore to Plaintiffs' the following:
A. Subjecting members to "physical harm" (Page XXIV).

*211 B. "[F]raud or deception concerning" "fundraising" and "financial costs." (Page XXIV).
C. "[A]cceptance of shamanism." (Page XXIV).
D. "[E]ngaged in drug smuggling and other criminal activity, including murder." (Page XXV).
E. "[D]enied their followers blood transfusions and medical access." (Page XXV).
F. "[E]ncouraged prostitution." (Page XXV).
F. "[S]ometimes raped women." (Page XXV).
G. "[M]olested children." (Page XXV).
H. "[B]eaten their disciples." (Page XXV).
I. "[P]ractices black magic and witchcraft." (Page XXV).
17. The Encyclopedia's introduction expressly and implicitly imputes these "Characteristics of Cults" to the religious organizations described in the text. The language, layout, tone and tenor of the introduction is designed to, and does, cause a reasonable reader to conclude that the organizations described in the Encyclopedia were selected for inclusion therein precisely because they possess the "Characteristics of Cults" and commit the misdeeds listed. Furthermore, the authors expressly characterize their descriptions of Plaintiffs as factual: "Facts are facts." (Page XIX).
In their motion for summary judgment, the publisher and authors argue that the Introduction section of the book cannot be defamatory, as a matter of law, because (1) "the foundational context of the Encyclopedia centers on doctrinal and apologetic issues of theology," and (2) the introduction cannot be reasonably interpreted to defame every group in the book. To determine these issues, we consider first whether the label "cult" is actionable. Then, we turn to the issue of whether the negative attributes and practices attributable to "cults" are actionable.

a. Is being labeled a "cult" actionable?
The Introduction of the Encyclopedia defines a "cult" as "a separate religious group generally claiming compatibility with Christianity but whose doctrines contradict those of historic Christianity and whose practices and ethical standards violate those of biblical Christianity." In their motion, the publisher and authors claim that the Introduction "centers on doctrinal and apologetic issues." We agree. Under the Establishment Clause of the First Amendment, civil courts are prohibited from deciding theological matters, or interpreting religious doctrine, or making matters of religious belief the subject of tort liability. See Serbian Eastern Orthodox Diocese v. Milivojevich, 426 U.S. 696, 707, 96 S.Ct. 2372, 2379, 49 L.Ed.2d 151 (1976).
The issue of whether a group's doctrines are compatible with Christianity depends upon the religious convictions of the speaker. "Whether [a] statement of religious doctrine or belief is made honestly or in bad faith is of no moment, because falsity cannot be proved." Tilton v. Marshall, 925 S.W.2d 672, 679 (Tex.1996). "As such, no jury can be allowed to determine [the truth or falsity of one's religious beliefs] for `[w]hen triers of fact undertake that task, they enter a forbidden domain.'" Id. at 680 (quoting United States v. Ballard, 322 U.S. 78, 86, 64 S.Ct. 882, 886, 88 L.Ed. 1148 (1944)).
In Tran v. Fiorenza, 934 S.W.2d 740, 742 (Tex.App.-Houston [1st Dist.] 1996, writ denied), the plaintiff, a Catholic priest, sued Bishop Fiorenza for defamation because *212 the bishop wrote a letter in which he stated that the plaintiff had been excommunicated by the Catholic church. This Court held that it could not hear the plaintiff's defamation claim because, to decide whether a tort had, in fact, occurred, we would have to decide whether the plaintiff had been excommunicated, a matter of ecclesiastical concern. Id. at 744. The First and Fourteenth Amendments of the United States Constitution prohibit civil courts from deciding such ecclesiastical matters. Id. at 743.
Therefore, we conclude that being labeled a "cult" is not actionable because the truth or falsity of the statement depends upon one's religious beliefs, an ecclesiastical matter which cannot and should not be tried in a court of law. See Sands v. Living Word Fellowship, 34 P.3d 955, 960 (Alas.2001) (holding that reference to church as "cult" and church member as "cult recruiter" not actionable as defamation because statements convey religious belief and opinion and are not capable of being proven true or false).

b. Is the description of the negative characteristics of a cult actionable?
The Introduction of the book contains a list of 12 "characteristics of cults." The 12 characteristics of cults include the following.
1. Despite the claim to be a friend of Christianity, the new religious are rejecting or hostile to Christianity.
2. Despite the claim to allow for individual expression and to respect members as individuals, we discover a destructive authoritarianism and sanction-oriented mentality: members must obey explicitly or be punished or ex-communicated.
3. Despite a claim to interpret the Bible properly, the Bible is systematically misinterpreted, either through additional revelation that distorts proper biblical interpretation or through alien (mystical, symbolic, subjective) methods of interpretation.
4. Despite a claim to care for members, members are often subject to psychological, physical and spiritual harm through cult dynamics that reject biblical, ethical and pastoral standards.
5. Despite a claim to allow independent thinking, there is a restriction of independent thought, a rejection of reason and logic, and often unquestioning obedience to the leader or organization.
6. Despite public claim for openness and tolerance to other religions, exclusivism and intolerance are taught privately.
7. Despite the claim for independent verification and objective evidence in support of a group's beliefs and practices, the evidence is almost exclusively based in undocumented claim or the subjective realm  mystical experience or powerful occult experience.
8. Despite the claim to offer true spirituality and a genuine experience of God or ultimate reality, and despite the claim not to be occult, what is offered is often occult practices and beliefs.
9. Despite the claim for accurately representing one's history and to give a true portrait of a group's leader(s), there is a distortion  reinvention and cover-up  of a group's history and leader for purely advantageous interests.
10. Despite the claim to trust others, cults may be paranoid or persecution conscious, and they may be oppositional or alienated from the culture, having beliefs, values and practices opposed to those in the dominant culture.
11. Despite the claim for honesty there is use of intimidation or deception on both members and outsiders. There is often fraud or deception concerning a *213 group's true teachings, the life of the founder, the group's history, fund-raising, front groups and financial cost.
The section of the book on the "characteristics of cults" concludes with the following paragraph, upon which most of the church's libel claims are based:
When people are manipulated in different ways for ulterior motives, as cults are shown to do in this Encyclopedia, is not this to be condemned? Those cult leaders or gurus who have encouraged their followers to oppose moral convention, denied their followers blood transfusions and medical access, encouraged prostitution for making converts, sometimes raped women, beaten their disciples, molested children, practices black magic and witchcraft, engaged in drug smuggling and other criminal activity, including murder  do they not deserve the condemnation of us all? And such things have occasionally happened even in what many people regard as the "respectable" cults.
The church contends that some of the conduct mentioned in connection with the characteristics of cults  prostitution, rape, beating, molesting children, drug smuggling, and murder  are facts that can be proven false, and, therefore, are actionable under Milkovich v. Lorain Journal Co., 497 U.S. 1, 20, 110 S.Ct. 2695, 2706-07, 111 L.Ed.2d 1 (1990) (holding that statements of "opinion" may be actionable if containing facts provable as false).
The publisher and authors, however, argue that the characteristics of cults  including the criminal acts that the church contends are provable as false under Milkovich  "cannot reasonably be interpreted to defame every group in the book." In other words, the publisher and authors argue that the second element of a defamation claim  that a defamatory statement was made concerning the plaintiff  cannot be met. We agree.
If a statement does not concern appellants, it cannot defame them, nor can it injure their reputations. See Newspapers Inc. v. Matthews, 161 Tex. 284, 339 S.W.2d 890, 893 (1960). For a plaintiff to recover for the publication of an allegedly libelous statement, the asserted libel must refer to some ascertained or ascertainable person and that person must be the plaintiff. Id. The publication need not make direct reference to the plaintiff individually; reference may be indirect, and it is not necessary that every listener understand it, so long as there are some who reasonably do so. Davis v. Davis, 734 S.W.2d 707, 711 (Tex. App.-Houston [1st Dist.] 1987, no writ).
Under the group libel doctrine, a plaintiff has no cause of action for a defamatory statement directed to some or less than all of the group when there is nothing to single out the plaintiff. Eskew v. Plantation Foods, Inc., 905 S.W.2d 461, 462 (Tex.App.-Waco 1995, no writ); Wright v. Rosenbaum, 344 S.W.2d 228, 231-33 (Tex. Civ.App.-Houston 1961, no writ) (holding that statement that "one of the four ladies" stole dress, but not naming guilty person, was not slanderous of any particular person); Bull v. Collins, 54 S.W.2d 870, 871-72 (Tex.Civ.App.-Eastland 1932, no writ) (holding that statement that either A or B stole the money, without specifying guilty party, not slanderous); Harris v. Santa Fe Townsite Co., 58 Tex.Civ.App. 506, 125 S.W. 77, 80 (1910, writ ref'd) (holding that statement that an unnamed "band of nine women" from South Silsbee cut a fence was not libelous because 15 women lived in South Silsbee).
In Eskew, the chief executive officer of the defendant company stated in the newspaper that "[I]rregularities in the company's maintenance department prompted *214 personnel changes.... Everyday we hire people, let people go and people quit.... I don't want to take the chance of coloring the innocent with any kind of accusation. I don't think everyone we let go had something to do with this. But some of those we let go, we think, were involved." 905 S.W.2d at 462. The plaintiff, one of the employees the defendant company had fired, sued for libel, contending that the chief executive officer's statement identified plaintiff as a wrongdoer even though he was not named in the story. Id. The court of appeals stated that "[the chief executive officer's] statement did not malign the entire group and is clearly referable only to an unidentified portion of a group." Id. at 463. As such, summary judgment was proper for the defendant company. Id. at 464.
Thus, in order for an alleged defamatory statement that is directed to an unidentified group of individuals to be actionable, it must create the inference that all members of the group have participated in the activity that forms the basis of the libel suit. If the statement refers to some, but not all members of the group, and does not identify to which members it refers, it is not a statement of and concerning the plaintiff.
The church argues that, under Gibler v. Houston Post Co., 310 S.W.2d 377, 385 (Tex.App.-Houston [1st Dist.] 1958, writ ref'd n.r.e.), the statements regarding the alleged criminal acts are actionable, even if the church is not directly mentioned in connection with the criminal acts. Under Gibler, a libel plaintiff may maintain a cause of action, even if not named in the publication, if the language of the publication and the surrounding circumstances are such that friends and acquaintances of the plaintiff recognize that the publication is about the plaintiff. Id. In its petition, the church alleges that the book has defamed every group named therein. Specifically, the church alleges that the Introduction of the book "is designed to, and does, cause a reasonable reader to conclude that the organizations described in the Encyclopedia were selected for inclusion therein precisely because they possess the `Characteristics of Cults' and commit the misdeeds listed."
To the contrary, the Introduction of the book specifically states that "[t]he list [of the characteristics of a cult] is not exhaustive. Not all groups have all the characteristics and not all groups have every characteristic in equal measure...." The appropriate inquiry in determining what a reasonable reader would believe, for the purposes of libel, is objective, not subjective. See New Times v. Isaacks, 146 S.W.3d 144, 162 (Tex.2004). The question is not whether some actual readers were misled by the publication, as they inevitably will be, but whether the hypothetical reasonable reader could be. Id. Moreover, the prefatory language "[t]hose cult leaders or gurus" is restrictive  focused only upon those leaders who commit such acts, not on all leaders or gurus. In sum, considering the Introduction as a whole, we cannot conclude that a reasonable reader could believe that all groups named in the book participate in the criminal activities that plaintiffs claim as the basis of their libel action. No reasonable reader could conclude that the book accuses the church, and, in fact, every other church named in the book, of rape, murder, child molestation, drug smuggling, etc. As such, the allegedly libelous statements in the Introduction are not "of and concerning the church" and are not actionable.

2. Is the Doctrinal Appendix Defamatory?
The church also contends in its petition that it has been defamed by certain portions of language in the Doctrinal Appendix. *215 Specifically, paragraph 18 of the petition alleges the following:
18. The Encyclopedia also includes a section entitled "Doctrinal Appendix." This Section attacks the groups included in the Encyclopedia, including Plaintiffs with further defamatory statements including the following:
A. The groups included in the book "accept occult powers." (Page 708);
B. The groups included in the book are "associated with idolatry" and "universally promote idolatry" with its inevitable outcome "human sacrifice." (Pages 710, 721);
C. The groups included in the book engage in "murder," "child sacrifice," "prostitution," and "snake worship" (Pages 714, 722).
In their motion for summary judgment, the publisher and authors argue that the Doctrinal Appendix section of the book cannot be defamatory, as a matter of law, for the same reasons that the Introduction is not defamatory, i.e., because (1) "the foundational context of the Encyclopedia centers on doctrinal and apologetic issues of theology" and (2) the Doctrinal Appendix cannot be reasonably interpreted to defame every group in the book. To determine these issues, we consider first whether being accused of "accepting occult powers" and "promoting idolotry" is actionable. Then, we turn to the issue of whether the negative attributes and practices attributable to "cults" are actionable.

a. Is being accused of "accepting occult powers" and "promoting idolatry" actionable?
The Doctrinal Appendix defines "idolatry" as the "worship of false gods and spirits" and occult [demonic] powers and practices are associated, in the text, with idolatry. The section of the Doctrinal Appendix on the occult and idolatry is entitled "The Occult: The Modern Spiritual Counterfeit."
As with the definition of the term "cult," which we discussed earlier, whether someone worships a false god or accepts occult powers and practices depends upon the speaker's religious beliefs. "To avoid conducting `heresy trials,' courts may not adjudicate the truth or falsity of religious doctrines or beliefs." Tilton, 925 S.W.2d at 678-79. "Heresy trials are foreign to our Constitution. Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs." Unites States v. Ballard, 322 U.S. 78, 86-87, 64 S.Ct. 882, 886-87, 88 L.Ed. 1148 (1944).
Because the statement concerns the speaker's religious beliefs, which cannot be proved true or false, an allegation that one is an idolator and accepts occult powers is not actionable.

b. Are the statements regarding human sacrifice, murder, child sacrifice, prostitution, and snake worship actionable?
The publisher and authors argue that the occult practices that are mentioned in the Doctrinal Appendix, "cannot reasonably be interpreted to defame every group in the book." In other words, the publisher and authors argue again that the second element of a defamation claim  that a defamatory statement was made concerning the plaintiff  cannot be met. Again, we agree.
None of the passages alleged to be defamatory in the Doctrinal Appendix mention the church at all. The occult practice of human sacrifice, which gives rise to one of the church's libel allegations, is mentioned in the following passage:
As [the Bible verses referenced earlier] suggest, in ancient Israel occult practices were associated with idolatry *216 (worship of false god and spirits) and inevitably led to human sacrifice, as is increasingly occurring in the Western world today.
This passage does not accuse the church, or indeed any of the organizations named in the book, of human sacrifice. Instead, it points out that, in ancient Israel, idolatry led to human sacrifice, in the authors' opinion. As such, the statement regarding human sacrifice is not of and concerning the church.
The occult practices of child sacrifice and murder, which give rise to another of the church's libel allegations, are mentioned in a section of the Doctrinal Appendix that lists what the authors refer to as "the capacities or methods of fallen angels [demons]." Again, the passage does not refer to the church at all, or any other organization in the book. There is nothing in this list of "demonic powers" to lead a reasonable reader to conclude that the church possesses or uses these powers to commit child sacrifice or murder. As such, the passage in the Doctrinal Appendix that refers to child sacrifice and murder is not of and concerning the church.
The occult practices of child sacrifice, prostitution, and snake worship are mentioned in the following passage from the Doctrinal Appendix.
IDOLATRY (Gr.eidololatria). Idolatry in ancient times included two forms of departure from the true religion: the worship of false gods (whether by means of images or otherwise); and the worship of the Lord by means of images. All the nations surrounding ancient Israel were idolatrous.... The gods had no moral character whatsoever, and worship of them carried with it demoralizing practices, including child sacrifice, prostitution and snake worship....
Again, this clearly does not refer to the church or any of the organizations named in the book. It is a historical reference to ancient Israel and what the authors perceive as the result of idolatry in that day and age. As such, it is not a statement of and concerning the church and is not actionable.
In sum, considering the Doctrinal Appendix as a whole, we cannot conclude that a reasonable reader would believe that all groups named in the book participate in the "occult practices" that plaintiffs claim as the basis of their libel action. Because the allegedly libelous statements in the Doctrinal Appendix are not of and concerning the church, they are not actionable.

3. Is the Chapter regarding "The Local Church" Defamatory?
The church does not allege that the chapter on it contains defamatory language. Instead, it argues that the fact that there is a chapter on it would lead a reasonable person to conclude that it "routinely engage[d] in the activities set forth in paragraph 16 and 18 above." Specifically, the petition alleges the following:
19. The Encyclopedia contains a section entitled "The Local Church." This section also expressly identifies Living Stream Ministry. When read in conjunction with the Encyclopedia's introduction and appendix, this section conveys false and defamatory message [sic] that the Local Church, the Churches, and Living Stream Ministry routinely engage in the activities set forth in paragraph 16 & 18 above. The section of the Encyclopedia entitled "The Local Church" is reasonably read in conjunction with and in the context of the Encyclopedia's introduction and appendix, including the "Characteristics of Cults" subsection. The contents of these sections, including the defamatory statements described herein, were understood *217 by readers to refer to and concern the Plaintiffs herein.
20. The above-described statements are defamatory per se in that they falsely impute immoral, illegal and despicable actions to Plaintiffs. In truth and in fact no Plaintiff has ever engaged in such actions. The false and defamatory statements set forth herein expose Plaintiffs to hatred, contempt, ridicule, and financial injury.
The gist of the church's complaint is that, by calling it a "cult" and including a chapter on it in the book, the publisher and authors have accused it of every "immoral, illegal and despicable action" mentioned in the book. However, as we stated earlier, under the group libel doctrine, a plaintiff has no cause of action for a defamatory statement directed to some or less than all of the group when there is nothing to single out the plaintiff. Eskew, 905 S.W.2d at 462. We have already held that nothing in the book singles out the church as having committed the "immoral, illegal, and despicable" actions alleged in its petition. Simply being included in a group with others who may have committed such "immoral, illegal, and despicable" actions does not give rise to a libel claim.

CONCLUSION
Because the allegedly libel statements are not defamatory, as a matter of law, we sustain the publisher and authors' first issue on appeal. Accordingly, we need not address the remaining issues and decline to do so.
We reverse the judgment of the trial court and render judgment that the church take nothing from the publisher and authors.
NOTES
[1] See U.S. CONST. amends. I, XIV; TEX. CONST. art. 1, §§ 8, 29.