**COURT OF APPEALS**
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**


**NO. 2-08-400-CV**

JACK D. BROCK                                                             APPELLANT

V.

JULIE FREDERICK TANDY                                               APPELLEE

------------

FROM THE 153RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1] ON REHEARING

------------

### I. Introduction

In this accelerated interlocutory appeal,[2] Appellant Jack D. Brock complains that the trial court erred by denying his motion for traditional and no evidence summary judgment in favor of Appellee Julie Frederick Tandy. While

---

[1] *See* Tex. R. App. P. 47.4.

[2] *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(6) (Vernon 2008).

we deny Brock's motion for rehearing, we withdraw our earlier opinion and judgment of May 14, 2009, and substitute the following. We affirm.

## II. Factual and Procedural Background

This defamation action arose from disputes between Brock and the City of Keller ("City") regarding Brock's real property — specifically, a subdivision plat that Brock had originally submitted for development in 1999, but that was signed in 2004; the condemnation of an easement by the City for water drainage across some of Brock's property in 2007; and the denial, at some point before May 12, 2007, of Brock's application to change zoning on some of his property so he could put a RaceTrac gas station on it.[3] Tandy was elected mayor in 2003 and 2005; she was not reelected in 2007.

Brock paid for the following advertisement (the "Ad"), along with a copy of the controversial plat, to run in *The Keller Citizen*, a local newspaper, on May

---

[3] In 1991, Brock began the process of developing some of his property into a residential subdivision. In 1992, the City approved the plat for the first phase, West Park I, and the installation of water and sewer for all phases of the West Park Subdivision development. The City subsequently approved West Park II's plat. At some point between 1992 and 1999, the events leading to the dispute over the water drainage easement began. In 1999, the City approved West Park III's plat.

In 2001, Brock discovered that his plat for West Park III was unsigned. Brock also began damming the inlet into his drainage ditch to prevent the City from using it. The City eventually filed a condemnation action to acquire a drainage easement. A unanimous City Council voted to condemn the easement on Brock's property.

2

4, 2007, eight days before the mayoral election that Tandy lost.  The Ad

stated:

> This is a copy of the final plat of West Park Addition in Keller. I originally had an approved plat in 1999 that was destroyed by a corrupt City Hall.  I could not[4] prove that I had received approval, and so had a new plat made in 2004.  In the signature and dedication section, you will see my name notarized and dated June 3, 2004.  You will see that the plat is shown to have been recorded June 18, 2004, at the county courthouse and is located in Cabinet A, slide 9330.  In the box under the county clerk's name, our own mayor's signature appears dated June 15, 1999. The only problem is *she wasn't mayor in 1999!* Like me, she really signed it in June 2004, but backdated the signatures to cover up the corruption.  More than corruption, this amounts to fraud.  And recording a fraudulent document is a felony.
>
> In the past few months, citizens of Keller have witnessed flooding on Whitley Road that has wrongly been blamed on me. The blame should be directed at Mayor Tandy and Councilman Steve Trine who refused to meet with me and were too busy to find out what mistakes the City Manager and his staff made to cause this mess.  Only two council members wanted to know the truth.  The truth is the City Manager and three members of his staff made a verbal agreement with me for an easement in June of 2004.  But our mayor and her friends voted in March 2007 to steal it the old-fashioned way—eminent domain.  They decided to take my land by force now and face the damage suit later.  The city ruined my pasture by condemning a strip of land through the middle of my property, turning my one piece of land into two separate parcels that are no longer connected.  Furthermore, by putting a drainage ditch through the middle of my property, they have ruined what were to be 20 future residential lots.  And the ditch they have

---

[4] Brock testified that *The Keller Citizen* printed his article with a typographical error, and that it should have read, "I could prove that I had received approval, and so had a new plat made in 2004."

3

put in doesn't even drain, but serves as a breeding ground for mosquitoes instead.

Last week I instructed my attorney to take a copy of the falsified plat to the Tarrant County District Attorney to have the following charges against the Mayor and staff investigated: 1) committing fraud and recording falsified legal documents, 2) conspiracy to deny me the use of my property, 3) violation of state and city water laws, and 4) trespassing on private property by diverting controlled ground water onto my property.

In the past, anytime the [C]ity of Keller has needed anything, I have willingly given. I have given my time. I have given my money. I have given road frontage and sewer easements free of charge. All the [C]ity has ever had to do was ask. After living here for 80 years, it is a sad day when I have to go to the county district attorney's office about the corruption in our city.

At the bottom of the Ad is the following legend, "Written and paid for by Jack Brock."

Tandy sued Brock, claiming libel per se. Brock moved for a traditional and no evidence summary judgment. The trial court denied Brock's motion, and this appeal followed.

### III. Discussion

In his first issue, Brock argues that the summary judgment evidence conclusively shows that the factual assertions that Tandy complains of were not defamatory and that there is no evidence that the assertions were defamatory. In his second and third issues, he presents the same arguments

4

with regard to the truth of the assertions and whether he made them with actual malice.

## A. Standard of Review

When a party moves for summary judgment under both rules 166a(c) and 166a(i), we will first review the trial court's judgment under the standards of rule 166a(i). *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 600 (Tex. 2004). If the nonmovant failed to produce more than a scintilla of evidence under that burden, then there is no need to analyze whether the movant's summary judgment proof satisfied the less stringent rule 166a(c) burden. *Id.*

Under rule 166a(i), the party without the burden of proof may, without presenting evidence, move for summary judgment after an adequate time for discovery on the ground that there is no evidence to support an essential element of the nonmovant's claim or defense. Tex. R. Civ. P. 166a(i). The motion must specifically state the elements for which there is no evidence. *Id.; Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 207 (Tex. 2002). The trial court must grant the motion unless the nonmovant produces summary judgment evidence that raises a genuine issue of material fact. *See* Tex. R. Civ. P. 166a(i) & cmt.; *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002).

5

When reviewing a no evidence summary judgment, we examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion. *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006). If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no evidence summary judgment is not proper. *Moore v. K Mart Corp.*, 981 S.W.2d 266, 269 (Tex. App.—San Antonio 1998, pet. denied). We review a no evidence summary judgment for evidence that would enable reasonable and fair-minded jurors to differ in their conclusions. *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005)).

## B. Libel per se

As a public official when Brock placed the Ad, Tandy has the burden to prove that Brock published a false statement of fact that was defamatory concerning her while acting with actual malice regarding the statement's truth. *See Bentley v. Bunton*, 94 S.W.3d 561, 579, 586 (Tex. 2002); *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998), *cert. denied*, 526 U.S. 1051 (1999). Tandy sued Brock claiming libel per se, i.e., that the printed words were so obviously hurtful to her that they require no proof of their injurious character to make them actionable. *See Clark v. Jenkins*, 248 S.W.3d 418,

6

437 (Tex. App.—Amarillo 2008, pet. denied), *petition for cert. filed*, 77 U.S.L.W. 3531 (U.S. Mar. 5, 2009) (No. 08-1122). On appeal, Brock asserts that four key statements in the Ad were not defamatory, were not false, and were not made with actual malice.[5]

## 1. Defamatory Meaning

Brock argues that Tandy had no defamation claim based on the following four statements:

(1) "Like me, she really signed it in June 2004, but backdated the signature to cover up the corruption. More than corruption, this amounts to fraud. And recording a fraudulent document is a felony."

(2) "The blame should be directed at Mayor Tandy and councilman, Steve Trine who refused to meet with me and were too busy to find out mistakes the City Manager and his staff made that caused this mess."

(3) "But our mayor and her friends voted in March 2007 to steal [the easement] the old fashioned way—eminent domain."

---

[5] Summary judgment cannot be granted except on the grounds expressly presented in the motion. *Johnson,* 73 S.W.3d at 204; *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 912 (Tex. 1997). Brock asks us to reverse the trial court's judgment denying his motion for summary judgment and to render judgment on his behalf. However, although Brock argues in his second issue that "[t]he summary judgment evidence conclusively demonstrates that the factual assertions complained of by [Tandy] were true or that there is no evidence that they were false," he did not raise this as a ground for summary judgment in his motion. Therefore, we may not address this issue for the first time on appeal. *See Johnson*, 73 S.W.3d at 204; *Martinez*, 941 S.W.2d at 912.

(4) "Last week I instructed my attorney to take a copy of the falsified plat to the Tarrant County District Attorney to have the following charges against the mayor and staff investigated: 1) committing fraud and recording falsified legal documents, 2) conspiracy to deny me the use of my property, 3) violation of state and city water laws, and 4) trespassing on private property by diverting controlled ground water onto my property."

Although Tandy made reference to these statements in her petition, she also reminds the court that we must read the Ad in its entirety and not just consider the individual statements in isolation.[6]

Libel is defamation expressed in written form that tends to injure a living person's reputation and thereby expose her to public hatred, contempt or ridicule, or financial injury or to impeach her honesty, integrity, virtue, or reputation. *See* Tex. Civ. Prac. & Rem. Code Ann. § 73.001 (Vernon 2005). Whether a publication is capable of being defamatory is initially a question of law to be determined by the court. *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 155 (Tex. 2004), *cert. denied*, 545 U.S. 1105 (2005); *Turner v. KTRK*

---

[6] Although Brock complains that Tandy did not plead a complaint to interpret the Ad and that she cannot now complain about imputed assertions of fraud and corruption, Tandy's petition is very broad, pleading defamation with reference to both specific statements and the Ad in general, stating, "Defendant intentionally published a written communication stating verifiable facts and accusations relating to Tandy in her official capacity as Mayor . . . . The Ad was unambiguous and the statements therein were false and made with actual malice and with knowledge of and reckless disregard for their falsity." She attached a copy of the Ad to her petition, along with Brock's deposition.

*Television, Inc.*, 38 S.W.3d 103, 114 (Tex. 2000). To make this determination, the trial court should consider whether the words used are reasonably capable of defamatory meaning by considering the allegedly defamatory statement as a whole. *See Musser v. Smith Prot. Servs., Inc.*, 723 S.W.2d 653, 654–55 (Tex. 1987). The determination is based on how a person of ordinary intelligence would perceive the entire statement. *See Bentley*, 94 S.W.3d at 579; *Harvest House Publishers v. Local Church*, 190 S.W.3d 204, 210 (Tex. App.—Houston [1st Dist.] 2006, pet. denied), *cert. denied*, 127 S. Ct. 2987 (2007). And even if individual statements considered in isolation are literally true or non-defamatory, a publication can convey a false and defamatory meaning by omitting or juxtaposing facts. *See Turner*, 38 S.W.3d at 114–15. A publication as a whole may be defamatory if the publication creates a false impression. *See id.* at 117–18.

Additionally, as Tandy was a public official at the time, the statements must be of such character that, if they were true, would have subjected her to removal from office, to criminal charges, or to imputation of official dishonesty or corruption. *See Bentley*, 94 S.W.3d at 582 ("Accusing a public official of corruption is ordinarily defamatory per se."); *Brasher v. Carr*, 743 S.W.2d 674, 677 (Tex. App.—Houston [14th Dist.] 1987) ("Statements that are of such a character as, if true, would subject a public official to removal from office or

9

charge him with a crime are libelous per se."), *rev'd on other grounds*, 776 S.W.2d 567 (Tex. 1989).

In its entirety, a reasonable person could interpret the Ad's overall gist to be that a "corrupt City Hall" (via its corrupt employees) destroyed Brock's West Park III plat some time between 1999 and 2004, after it had been approved; that Tandy committed a felony by backdating her signature in 2004 to cover up the corruption involved in destroying Brock's original plat (backdating rendering the plat fraudulent) and by then recording the fraudulent plat; that Tandy was also to blame for Brock flooding Whitley Road because she refused to meet with him and was too busy to look into mistakes caused by City employees (allowing them to run amuck); and that in March 2007, Tandy voted to steal his land via eminent domain, ruining his pasture and his development plans, after conspiring to deny him the use of his property, violating state and city water laws, and trespassing on his property by diverting controlled ground water onto it.[7]

---

[7] Tandy testified that she was not aware of any controversies between the City and Brock regarding the Phase III plat prior to May 4, 2007. She stated in her affidavit that she did not fill in the date after her signature when she signed the plat in 2004. She also testified that she did not vote on the council's decision to condemn Brock's property and that the council vote was unanimous. Tandy testified that her reputation in the community had been damaged by the Ad, based on feedback and comments that she received, and that she had never met Brock before his deposition.

10

A reasonable person could view the Ad as appearing to impeach Tandy's honesty or reputation and to expose her to public hatred, contempt, or ridicule. *See* Tex. Civ. Prac. & Rem. Code Ann. § 73.001; *Isaacks*, 146 S.W.3d at 155; *Turner*, 38 S.W.3d at 114–15; *Musser*, 723 S.W.2d at 654–55. Furthermore, the Ad tends to impute official dishonesty and corruption to Tandy. *See Bentley*, 94 S.W.3d at 582; *Brasher*, 743 S.W.2d at 677. Therefore, we conclude that the publication as a whole, as well as at least one of its individual statements,[8] is capable of being defamatory, and we overrule Brock's first issue.[9]

---

[8] Specifically, statement (1), which accuses Tandy of official dishonesty, could appear to a reasonable person to be defamatory.

[9] Brock has requested by motion that we take judicial notice of the copies of the City's charter and article 4 of the City's Unified Development Code, and by supplemental motion that we take judicial notice of the copies of article 4 of the City's Unified Development Code and section 16-204 of the City's Subdivision Ordinance Number 571, dated March 29, 1989, that he supplied to the court. We grant his original motion in part, as to the charter, because he presented this same request to the trial court. We deny the remainder of his original motion.

Even if we were to grant his motion and supplemental motion as to article 4, which he did not present to the trial court, in light of our resolution above with regard to the imputation of official dishonesty, we need not also address his argument that, although Tandy allegedly violated article 4, she failed to show that backdating was a basis to remove her from her office as mayor. *See* Tex. R. App. P. 47.1; *see also* Tex. Penal Code Ann. § 37.10(a)(1)–(3), (c)(1) (Vernon Supp. 2008) (defining tampering with governmental records as a state jail felony when committed with intent to defraud), and Keller, Tex., Charter art. III, § 3.02 (2008) (stating that "[a] member of the council . . . who is convicted of a felony while in office shall immediately forfeit his office"). And although

11

**2. Actual Malice**

To establish actual malice, the plaintiff must prove that the defendant published a defamatory falsehood "with knowledge that it was false or with reckless disregard of whether it was false or not." *WFAA-TV*, 978 S.W.2d at 573 – 74 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S. Ct. 710, 726 (1964)).  Reckless disregard is a subjective standard that requires the plaintiff to bring forth evidence that the defendant entertained serious doubts as to the truth of the publication at the time it was published. *Hearst Corp. v. Skeen*, 159 S.W.3d 633, 637 (Tex. 2005).  A presentation of facts that is misleading, even negligently so, will not constitute a "calculated falsehood" unless those facts are published with knowledge or strong suspicion by the publisher that they are misleading. *See Turner*, 38 S.W.3d at 120.

Actual malice focuses on the defendant's state of mind, particularly his attitude toward the truth of what he reported, which a plaintiff can prove through objective evidence about the publication's circumstances and the defendant's conduct at the time of publication. *Id.*; *WFAA-TV*, 978 S.W.2d at 573–74; *see also Bentley*, 94 S.W.3d at 591, 596.  When the defendant's

his supplemental motion purports to submit section 16-*204* of the City's Subdivision Ordinance, the section actually submitted and certified is 16-*240*. We deny his supplemental motion in its entirety.

12

words lend themselves to more than one interpretation, the plaintiff must establish either that the defendant knew that the words would convey a defamatory message or that he had reckless disregard for their effect. *Isaacks*, 146 S.W.3d at 162. Publications alleged to be defamatory must be viewed as a whole—including accompanying statements, headlines, pictures, and the general tenor and reputation of the source itself, and we consider the actual malice issue within this context. *See City of Keller*, 168 S.W.3d at 811 (citing *Isaacks*, 146 S.W.3d at 158–59, for the proposition, with regard to a no evidence assertion, that legal sufficiency cannot disregard parts of a publication, considering only false statements to support a plaintiff's verdict or only true ones to support a defense verdict). And, as the Supreme Court of Texas has stated:

> To disprove actual malice, a defendant may certainly testify about his own thinking and the reasons for his actions, and may be able to negate actual malice conclusively. But his testimony that he believed what he said is not conclusive, irrespective of all other evidence. The evidence must be viewed in its entirety. The defendant's state of mind can—indeed, must usually—be proved by circumstantial evidence. A lack of care or an injurious motive in making a statement is not alone proof of actual malice, but care and motive are factors to be considered. An understandable misinterpretation of ambiguous facts does not show actual malice, but inherently improbable assertions and statements made on information that is obviously dubious may show actual malice. A failure to investigate fully is not evidence of actual malice; a purposeful avoidance of the truth is. Imagining that something may be true is not the same as belief.

13

*Bentley*, 94 S.W.3d at 596 (internal citations omitted).

### a. Brock's Testimony

Tandy attached Brock's deposition to her response to his motion for summary judgment. Brock testified that he did not need to research the facts in the Ad because they were known to him personally,[10] and he gave the following explanation:

> Q. Okay. Did you intend the readers of The Keller Citizen to understand the meaning of this [A]d, that it was about corruption, that it was about fraud?
>
> A. Yes, because every week in The Keller Citizen[,] the City Manager had the—had the Assistant City Manager . . . go down there and tell them that the only reason that the water was being flooded on Whitley Road by me was because of some RaceTrac gasoline [station] that was rejected,[11] and the final blow on this is when they sat up here and—with Julie Tandy as mayor and signature of the City of Keller to sit up here and took a vote to condemn my property when they are illegally putting water on me.

He testified that he had never met Tandy prior to his deposition, and that with regard to the Ad, "[t]his was not a personal attack on Julie Tandy as a person, only as the signature for the City of Keller." He also testified that the mayoral election date had nothing to do with the date that he ran the Ad.

---

[10] Brock also stated in his affidavit attached to his motion for summary judgment that at the time he published the Ad, he "believed its contents."

[11] Brock reapplied for a zoning change for the RaceTrac gas station after Tandy lost the mayoral election and one of the council members had been replaced.

Brock admitted that he assumed that Tandy knew about the backdating because she was the mayor.[12] He did not try to find out who had done the backdating. He testified that he assumed that the City had destroyed the 1999 plat because they had no record of it when he asked for it.[13] He admitted that he did not research whether recording a fraudulent document is a felony, and he stated, "I just know that it's fraudulent, and you go down there and record a—a document that's fraudulent is a felony." He also stated that he would call that action a felony whether it was or was not, and that, with regard to his Ad, "as far as [he was] concerned, it is all fact," and that he did not imagine it.

Brock gave the following testimony about whether Tandy refused to meet with him:

---

[12] Brock testified that Otis Welch, the chairman of the planning and zoning commission who also signed the plat in 2004, did not commit a felony "because, actually, he probably didn't know" that his signature was going to be backdated.

[13] Brock claimed that the City destroyed his Phase III plat, having "heard from one of the City employees that some lady went down there where the plats and everything was kept with a garbage can and threw every plat in it in the garbage," but he did not remember who the City employee was or who the "lady" was who allegedly threw the plats away.
Brock also testified that he did not recall receiving a letter from the City in September 1999, after the approval of his final Phase III plat, requesting that he submit required information for filing with Tarrant County, but he later testified that he hand-carried all of the requirements within the thirty-day time limit set out in the letter. He also did not recall receiving a second notice requesting the same information in February 2000.

15

Q. Isn't it true that they offered to meet with you?

A. Only if I would take and give them an easement.

Q. And you refused?

A. I have a letter from the City Attorney, stating the only way that they would meet with me is if I went ahead and gave them an easement to take illegal water across my property and trespass on me.[14]

Q. So when you say they refused to meet with you, that isn't true, is it?

A. They wouldn't meet with me unless the stipulations went with it.

Q. So they would meet with you. . . . if you met the stipulation.

A. I can't meet those stipulations.[15]

---

[14] The December 22, 2006 letter from the City Attorney to Brock's attorney stated, in pertinent part:

As you are aware, the [City] has initiated proceedings to acquire a drainage easement across [Brock's] property. In a good faith attempt to discuss and possibly resolve the issues relating to this acquisition, I have been instructed to convey to you that the Mayor and two City Council members would be willing to meet personally with your client at Town Hall at a mutually convenient time. As a prerequisite to the meeting, your client, as a show of good faith, must remove the existing "dam" and other fill or materials so as to allow full flow of water across the current drainage ditch.

[15] In his affidavit, Brock stated, "I was unwilling to have the meeting under these conditions."

With regard to the vote to condemn his property, Brock explained that "and her friends" referred to the City Council, but he acknowledged that Tandy, as mayor, did not cast a vote on the decision to condemn the easement. He faulted Tandy for not behaving the way he had when he was mayor.[16]

With regard to his statement about instructing his attorney to take the plat to the Tarrant County district attorney, Brock gave the following testimony:

> Q. . . . When you put that in the ad, did you intend for people reading it to understand that Julie Tandy had committed fraud and recorded falsified legal documents?
>
> A. The City of Keller and staff. . . . The mayor and staff investigated. . . . I wanted to understand that I was going to have it investigated by the DA.
>
> . . . .
>
> Q. And didn't you want them to believe it was true?
>
> A. That would be up to the individual . . . how they take it. If you're being investigated[, that] doesn't mean that you're guilty of anything. . . . I wanted them to believe that I was mad about this, about getting my property flooded. . . . I wanted the readers to believe it that it was going to be investigated to see if it was true.
>
> . . . .
>
> Q. What was your intent when you attributed these four criminal acts, committing fraud and recording falsified legal documents,

---

[16] Brock testified, "[W]hen I was mayor, if anything was wrong, I wouldn't let it happen." He stated in his affidavit that he held "multi terms as the [City's] mayor."

17

conspiracy to deny me the use of my property, violation of state and city water laws, trespass on private property by diverting controlled water onto my property, you attribute those four acts that you say you want investigated to Mayor Tandy. Did you intend for the readers to believe that she had committed those acts?

A. Not that she committed it.

Q. What did you intend for them to believe?

A. That the City was committing fraud, recording falsified documents. *I know she didn't go down there and record it.* Conspiracy to deny me the use of my property.

Q. Did she—did she do that?

A. She didn't—*no, she didn't do that*, but the City did. . . . And violate state and city water laws. It's on the books.

Q. So you have now gone through those four items and said Julie Tandy didn't do any of those things, correct?

A. No, I said the City did. . . . And she is the—part of the City.

Q. So when you say you want to have the following charges against the mayor and staff investigated . . . . is it your testimony that the mayor committed those acts?

A. I want the mayor and the staff investigated to see which one of those acts she's guilty of and the City staff, and by "her" I mean the City.

Q. And did you intend for the reader to believe that she had committed them?

A. No.

18

Q. Well, earlier in the ad and earlier in your testimony today you stated that she did commit fraud by recording a fraudulent document.

A. Mm-hmm. . . . I said that when you take and record something like this, it's fraud.

Q. So it's your testimony that Julie Tandy did commit fraud?

A. The mayor committed fraud.

Q. Mayor Julie Tandy?

A. Yes.  [Emphasis added.]

Brock testified that he had not thought about or looked into whether accusing Tandy of a felony related to her fitness for office or whether she could be removed from office, but that he did not intend to impeach her reputation or injure her in her office, although he acknowledged that injury to her reputation "could be one effect of it."  He also testified that he did not bother to investigate whether Tandy knew that her signature was backdated, because "[a]s far as [he] was concerned, it was done by the City."

Brock testified that he had known James Carson, a Keller City Council member, for six to eight months, that Carson had visited his home, and that he spoke with Carson on the phone probably three to four times, although he did

not keep track.[17]  He denied remembering any conversations with Carson discussing methods to unseat Tandy as mayor.  He acknowledged receiving a copy of the May 4, 2007 memo from the City Manager to the mayor and City Council about the Ad from Carson.[18]

### b.  Carson's Testimony

Tandy attached Carson's deposition to her response to Brock's motion for summary judgment.[19]  Carson testified that while he was on the Keller City Council, he had conversations with Brock about the plat and asked Otis Welch, one of the other signatories, about the backdating.  He learned from Welch (who learned from someone at Town Hall) that it was customary "to date the plat whenever it was actually approved by the Planning & Zoning and whenever

---

[17] Carson was on the Keller City Council during the last year of Tandy's second term.

[18] In the memo, the city manager states that the planning and zoning commission secretary (a city staff member) dated all of the City official signatures with the actual date of approval of the plat because he thought that both the signature date of the plat and the resolution date approving the plat in 1999 should be the same.  He also states that the backdating did not void the plat because all signatures and other essential documentation were in order when filed in 2004, although the city staff member should not have backdated the signatures. Carson testified that the city manager's explanation in response to the Ad was "the most likely truthful explanation."  Carson testified that he did not recall giving Brock a copy of the memo.

[19] Carson was deposed because of his role as a member of the City Council and because of his relationship with Brock.

it was approved by the City Council," and that was all the investigation he or Welch did.

Carson testified that he received a copy of the Ad from Brock's son before it was published, and he gave the following testimony about Brock and the Ad:

> Q. . . . So early 2007, [Brock] tells you he intends to publish the plat. What is your response to that?
>
> A. "Why?" My—I gave him my interpretation of the plat, which was that, "Yes, [Brock], it could be what you say it is. But it's also very likely that it's a simple mistake." . . . And his reply back to that was, "It can't be."
>
> Q. Okay. So his interpretation is what? When he comes to tell you about it in early '07, what does he say his interpretation of the plat is?
>
> A. He has repeatedly made the charge that this plat represents fraud, deliberate fraud.
>
> Q. And your response is?
>
> A. "You can't prove it, [Brock]." . . . What my thought was, was that the explanation that this is customary is just wrong, and whoever wrote the dates in was operating under the erroneous assumption that it is customary to backdate. That's—that was what I considered the most likely explanation . . . of this plat.

Carson estimated that he had this conversation with Brock two or three times, and he testified that Brock could not fathom that it could be just a simple mistake and that Brock was adamant that it was not. He testified that he

21

encouraged Brock not to run the Ad, that he never asked Tandy whether she knew her signature had been backdated, and that, to his knowledge, Brock never asked her either. Carson also testified that, to his knowledge, there was never any conspiracy to deny Brock the use of his property, and that he thought Brock ran the Ad to expose what Brock considered fraud and to cause Tandy to lose votes in the mayoral election, based on the timing of the publication and his conversations with Brock. Carson testified that although he voted to use eminent domain to take the easement on Brock's land, he regretted that vote.

Carson also admitted drafting the following language of a response to Tandy's open records request:

> Though not required by any law, you may also inform Ms. Tandy that communications by and between Jim Carson and Jack Brock or any of his business associates can be generally classified as either 1) Jim Carson listening to Jack Brock's telling or retelling of the real or perceived wrongs perpetrated by the City of Keller—particularly City Manager Lyle Dresher—against Jack Brock, his family, and/or his property, or 2) *Jim Carson and Jack Brock discussing (but not always agreeing on) methods to unseat Mayor Julie Tandy* and others.

[Emphasis added.] He testified that his conversations with Brock about unseating Tandy were different from their conversations about the Ad. Carson is the publisher and primary editor of a web log ("blog") named "Keller City Limits." He posted the draft response on his blog.

22

### c. Analysis

Less than a scintilla of evidence exists when the evidence is so weak that it does nothing more than create a mere surmise or suspicion of a fact. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983). More than a scintilla of evidence exists when the evidence would enable reasonable and fair-minded people to reach different conclusions. *Ford Motor Co.*, 135 S.W.3d at 601; *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). A genuine issue of material fact is raised by presenting evidence on which a reasonable jury could return a verdict in the nonmovant's favor. *Moore*, 981 S.W.2d at 269.

Although Brock stated in his affidavit that he believed the contents of the Ad at the time that he published it, Tandy presented evidence from Brock's deposition that he knew at least two of his statements were false (i.e., that Tandy did not actually vote on the decision to condemn the easement and that Tandy did not record the allegedly fraudulent plat); that at least one of his statements was not entirely true (i.e., that Tandy offered to meet with him, but with conditions he found unacceptable); and that he acted with reckless disregard as to the effect of his words. *See Isaacks*, 146 S.W.3d at 162; *WFAA-TV*, 978 S.W.2d at 571.

23

Furthermore, Tandy presented evidence that Brock acted with a lack of care with regard to the truth or falsity of his statements in that he did no research on whether Tandy backdated the plat (although he was willing to give the benefit of the doubt to one of the other signatories) and whether recording a fraudulent document was actually a felony; that Brock had a motive to have Tandy replaced as mayor; and that Brock refused to consider any other possibility besides fraud, even when presented with that possibility by Carson. *See Bentley*, 94 S.W.3d at 591, 596. Therefore, we conclude that the trial court did not err by denying Brock's motion for summary judgment because Tandy presented more than a scintilla of evidence of actual malice, and we overrule Brock's third issue.

## IV. Conclusion

Having overruled Brock's dispositive issues, we affirm the trial court's order, and we order Brock to pay Tandy's court costs and reasonable attorney's fees incurred in this appeal, to be determined by the trial court. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.015 (Vernon 2008). We grant in part and deny in part Brock's motion for judicial notice, and we deny his supplemental motion for judicial notice.

BOB MCCOY
JUSTICE

PANEL: CAYCE, C.J.; MCCOY and MEIER, JJ.

DELIVERED: July 2, 2009

24